CHEYENNE–ARAPAHO TRIBES OF
OKLAHOMA, Appellant,

v.

The STATE OF OKLAHOMA et
al., Appellees.

No. 78–1570.

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 24, 1980.

Decided March 25, 1980.

■■■■■■■

Jeanne S. Whiteing, Boulder, Colo. (Daniel H. Israel, Yvonne T. Knight, Native American Rights Fund, Boulder, Colo., on the briefs), for appellant.

John F. Percival, Asst. Atty. Gen. for the State of Oklahoma, Oklahoma City, Okl. (Jan Eric Cartwright, Atty. Gen. for the State of Oklahoma, Oklahoma City, Okl., on the briefs), for appellees.

Anthony C. Liotta, Deputy Asst. Atty. Gen., Robert L. Klarquist and Edward J. Shawaker, Attys., Dept. of Justice, Washington, D.C., filed briefs, for amicus curiae United States.

Before McWILLIAMS, BREITENSTEIN and LOGAN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Cheyenne-Arapaho Tribes of Oklahoma, plaintiff-appellant, sought to enjoin defendant-appellee State of Oklahoma from the exercise of jurisdiction over Indian hunting and fishing on land located within the reservation established by certain treaties and an Executive Order. The basic questions relate to what part of the pertinent land is within Indian Country as that term is defined in 18 U.S.C. § 1151 and what is the effect and application of the Assimilative Crimes Act, 18 U.S.C. § 13. Section 1362, 28 U.S.C., confers federal jurisdiction. The comprehensive opinion of the district court is not published. We affirm in part and reverse in part.

The Tribes are a federally-recognized tribal entity organized under the Oklahoma Indian Welfare Act of 1936, 49 Stat. 1967, 25 U.S.C. § 501 et seq. In 1865 and 1867 the United States entered into two treaties with the Tribes, 14 Stat. 703 and 15 Stat. 593. The earlier treaty created a reservation partly within both Kansas and Oklahoma as those states are presently established. The ratifying Act provided in an amendment that the President should designate a reservation, no part of which should be in Kansas. 14 Stat. 708. The second treaty did not abrogate the first treaty but did specify a reservation in Oklahoma. A misunderstanding of the location was clarified by an 1869 Executive Order which created the reservation with which we are concerned. See 1 Kapler, Indian Affairs, Laws and Treaties 839–841. This reservation was occupied by the Tribes.

The General Allotment Act of February 8, 1887, 24 Stat. 388, as amended 34 Stat. 182, authorized the President to allot portions of reservation land to tribal members and, with the consent of the Tribes, to sell surplus land to white settlers. The Act of March 2, 1889, 25 Stat. 980, established the Jerome Commission to negotiate with the Tribes. The Act of March 3, 1891, 26 Stat. 989, 1022, ratified the October 13, 1890, agreement between the government and the Tribes which provided:

"The said Cheyenne and Arapahoe tribes of Indians hereby cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest of every kind and character, in and to the lands embraced in the following described tract of country [the reservation established by the Executive Order] * * * * ."

The agreement provided that each member of the Tribes could choose 160 acres for his individual allotment. Id. at 1023. Title to the allotments was to be held in trust. Id. at 1024. The United States agreed to pay the Indians $1,500,000. Id. at 1024.

Indian hunting and fishing rights are not specifically mentioned in the 1865 or 1867 treaties or in the 1869 Executive Order. After reviewing the pertinent history and the negotiations between the government and the Tribes, the district court held:

"* * * the Tribes possessed exclusive hunting and fishing rights on the lands within the reservation established by the Executive Order even though these rights were not explicitly mentioned in the Treaties of 1865 and 1867 or the Executive Order."

The State of Oklahoma does not contend that this ruling of the district judge is erroneous. Br., p. 7.

*Ellis v. Page*, 10 Cir., 351 F.2d 250, 252, holds that the Allotment and Cession Agreement, together with congressional ratification, disestablished the Cheyenne-Arapaho Reservation. The Tribes say, Reply Br., p. 1, that they do not contest the district court's holding that the reservation was disestablished. The question is the effect of disestablishment on the hunting and fishing rights of the Indians.

After the cession, the lands of the disestablished reservation came within one of three classes: (1) land allotted to individual Indians, (2) land held in trust by the United States for the Indians, and (3) non-Indian land publicly and privately owned. With regard to classes (1) and (2) the Tribes say that they are within the definition of "Indian Country" and member hunting and fishing is beyond regulatory control by the state.

The Tribes say that state jurisdiction over non-Indian hunting and fishing in Indian Country is not an issue in this case, Reply Br., p. 1. They concede that hunting and fishing on non-Indian lands located within the 1869 reservation are not subject to exclusive Tribal control but rather subject to a system of dual regulation. It is enough to note that a number of decisions recognize dual control when needed to support conservation measures. See *Puyallup Tribe v. Department of Game of Washington*, 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689.

With the exceptions not here pertinent, 18 U.S.C. § 1151 defines Indian Country thus:

" * * * the term 'Indian Country' as used in this chapter means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or sub-sequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

Section 1151(c) explicitly includes Indian allotments within Indian Country. The problem relates to trust lands held by the government for Indians. The United States holds lands within the boundaries of the 1869 reservation in trust for the Tribes under a variety of statutes. See United States Amicus Brief, p. 6 n.3. The district court held that trust land was not reservation land and hence was not Indian Country under § 1151(a). The court left open the possibility that there might be a dependent Indian community as that term is used in § 1151(b) but found that the record was insufficient to make that determination.

*United States v. John*, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489, decided after the decision of the district court in the instant case, presented the question of criminal jurisdiction under the Major Crimes Act, 18 U.S.C. § 1153, over a crime committed on land held by the United States in trust for the Mississippi Choctaw Tribe. The Court held that the land was a reservation and that the United States had exclusive criminal jurisdiction over Indians on the land. The Court said, Id. at 649, 98 S.Ct. at 2549:

"The Mississippi lands in question here were declared by Congress to be held in trust by the Federal Government for the benefit of the Mississippi Choctaw Indians who were at that time under federal supervision. There is no apparent reason why these lands, which had been purchased in previous years for the aid of those Indians, did not become a 'reservation,' at least for the purposes of federal criminal jurisdiction at that particular time."

■ In 1945 the Solicitor for the Interior Department ruled that land acquired for the Cheyenne-Arapaho Tribes under the Oklahoma Indian Welfare Act had reservation status. Allotted lands of Organized Indian Tribes, 59 Decisions of Int. Dept. 1,

3. Some 3,400 acres of the trust land in question are covered by the Act of January 29, 1942, 56 Stat. 21, which declares that land held in trust by the United States for the Tribes is "subject to all provisions of existing law applicable generally to Indian reservations." We are convinced that, barring possible specific exceptions to which our attention is not directed, lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a).

Our holding that allotment lands and trust lands are Indian Country does not end the matter. The district court held that state hunting and fishing laws are applicable to Indians in Indian Country under the Assimilative Crimes Act, 18 U.S.C. § 13. That Act adopts state law for offenses committed within areas under federal jurisdiction when the act, though not punishable under federal law, would be punishable under state law. Section 1152, 18 U.S.C., extends the Assimilative Crimes Act to Indian Country except for (1) offenses by an Indian against the person or property of another Indian, (2) offenses by an Indian who has been punished under Tribal law, and (3) situations wherein treaty stipulations give exclusive jurisdiction to the Tribes.

■ States have no authority over Indians in Indian Country unless it is expressly conferred by Congress. See *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251, and *United States v. Kagama,* 118 U.S. 375, 383–384, 6 S.Ct. 1109, 1113–1114, 30 L.Ed. 228. Other decisions upholding this principle are *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 170–172, 93 S.Ct. 1257, 1261, 36 L.Ed.2d 129, and *Fisher v. District Court,* 424 U.S. 382, 386, 96 S.Ct. 943, 946, 47 L.Ed.2d 772 (reservation land); *United States v. Pelican,* 232 U.S. 442, 449–450, 34 S.Ct. 396, 399, 58 L.Ed. 676, and *DeCoteau v. District County Court,* 420 U.S. 425, 427, n.2, 95 S.Ct. 1082, 1084, 43 L.Ed.2d 300 (allotments).

■ The Assimilative Crimes Act does not assimilate state law which is inconsistent with federal policies expressed in federal statutes. See *Johnson v. Yellow Cab Co.,* 321 U.S. 383, 389–390, 64 S.Ct. 622, 625, 88 L.Ed. 814, and *Stewart & Co. v. Sadrakula,* 309 U.S. 94, 103–104, 60 S.Ct. 431, 435–436, 84 L.Ed. 596. Congress has consistently protected the hunting and fishing rights of Indians. Section 1162, 18 U.S.C., relates to state jurisdiction over offenses committed by or against Indians in Indian Country but in its subsection (b) expressly protects Indian hunting and fishing rights. Section 1165, 18 U.S.C., makes hunting and fishing on Indian land without permission a federal offense.

To support the position that the Assimilative Crimes Act does not make state hunting and fishing laws applicable to Indians in Indian Country, the Tribes rely heavily on *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697; *Kimball v. Callahan,* 9 Cir., 493 F.2d 564, cert. denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (Kimball I); and *Kimball v. Callahan,* 9 Cir., 590 F.2d 768 (Kimball II). With regard to the Menominee Indians and the Klamath Indians involved in Kimball I and II, the reservations and tribal authority had been terminated. Each of the cases holds that the hunting and fishing rights of the Indians survived termination.

The State argues that the Menominee and Kimball cases are not in point because they involve the interpretation and application of the 1954 Termination Acts which resulted from a change from the pre-1934 assimilation policy to a post-1934 self-determination policy. See *Mattz v. Arnett,* 412 U.S. 481, 496 n.18, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92. The argument is not persuasive. Allotments were the first step in assimilation. Termination is the last step and has not been reached so far as the Cheyenne-Arapaho Tribes are concerned. The probable reason is the repudiation of the allotment and sale of surplus land by the Indian Reorganization Act, 48 Stat. 984, amended and codified as 25 U.S.C. § 461 et seq. See *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 478–479, 96 S.Ct. 1634, 1643–1644, 48 L.Ed.2d 96.

Whatever the policies and changes in policy may have been, the rules of construction consistently announced and applied in Indian cases are controlling. A treaty must be carried out in accordance with the understanding of the Indians with full recognition of a federal obligation to protect the interests of a dependent people. *Tulee v. Washington*, 315 U.S. 681, 684–685, 62 S.Ct. 862, 864, 86 L.Ed. 1115. Abrogation of treaty rights will not be lightly implied, *Menominee Tribe v. United States*, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 69, and can be accomplished only by "clear and plain" congressional action. *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339, 353, 62 S.Ct. 248, 255, 86 L.Ed. 260. In a long line of decisions beginning with *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, and carrying through the 1979 decision in *Washington v. Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823, opinion filed July 2, 1979, the Supreme Court has been solicitous in its protection of the hunting and fishing rights of Indians.

Both the allotment lands and the trust lands are Indian Country. We agree with the statement in the Amicus Brief of the United States, p. 11, that: "It would be inconsistent to forbid states the right to control Indian hunting and fishing directly, and then to give that control back indirectly through the Assimilative [Crimes] Act."

We conclude that state hunting and fishing laws do not apply, directly or indirectly, to hunting and fishing by members of the Cheyenne-Arapaho Tribes on land held as Indian allotments and on land held in trust by the United States for the Tribes.

Reversed and remanded for further proceedings in the light of this opinion.