REQUESTED BY: Senator Gerald A. Conway Nebraska State Legislature State Capitol Lincoln, NE 68509
Dear Senator Conway:
You have asked for this office's opinion on several issues in connection with a proposed purchase of commercial lots in South Sioux City by the Omaha Tribe of Native Americans. Apparently the Tribe proposes to acquire this property and then possibly use part of it for operation of a tribe-owned bingo facility.
It is important to note at the outset that federal Indian law is extremely complex and, in many respects, rather unclear. While your letter seeks clear, simple answers, such cannot be given in this area of the law. The results in any given situation will depend on numerous factors, many of which simply cannot be foreseen in a hypothetical setting. Nonetheless, we will present some general guidelines which we hope will provide insight as to what is likely to occur should the Omaha Tribe's plan, as you describe it, become reality.
I. Law Enforcement
You ask for a description of the law enforcement responsibilities of federal, state and tribal authorities in connection with the tribe-owned land in South Sioux City in view of Public Law 280 and Nebraska's retrocession of criminal jurisdiction over the Omaha Reservation to the federal government in 1969.
In our letter of March 28, 1985, to Senator Goll regarding the proposed retrocession of the Winnebago Reservation in Thurston County we gave the following general background which is also useful in analyzing your inquiry. Generally speaking, federal Indian laws and treaties preempt state laws in Indian country so that without a specific federal statute delegating jurisdiction over areas of Indian country to a state, jurisdiction within Indian country remains exclusively in federal and tribal hands.
Public Law 280, enacted by Congress in 1953, did make a specific delegation of jurisdiction to Nebraska and four other states granting those states authority over criminal and civil matters arising within Indian country located within their borders.
It has generally been held, however, that this Public Law 280 grant of jurisdiction extended only to matters over which the federal government had earlier had authority and that it was not meant to detract from tribal jurisdiction as it existed. Therefore, it is "probable that this jurisdiction of the tribes remains concurrent with the states in Indian country subject to Public Law 280 to the same extent it was concurrent with the federal government prior to the Act." F. Cohen, Handbook of Federal Indian Law, 367 (1982 ed.).
In 1968 Congress amended Public Law 280 to provide the states a means to give back to the federal government "all or any part of the criminal or civil jurisdiction, or both" which the states had acquired under the original Public Law 280. 25 U.S.C. § 1323. This act of giving back jurisdiction to the federal government is called "retrocession."
In 1969 the Nebraska Legislature passed Legislative Resolution 37 which provided in pertinent part: [T]he State of Nebraska hereby retrocedes to the United States all jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, acquired by the State of Nebraska pursuant to Public Law 280 of 1953. (Emphasis supplied.) It is obvious from this that the Nebraska Legislature intended to retrocede criminal jurisdiction over Indian country in Thurston County only.
South Sioux City, of course, is not within Thurston County. Therefore, the issue is whether or not the retrocession of 1969 is also applicable to Omaha tribe-owned land outside of Thurston County. We do not believe that Legislative Resolution 37 went that far and that state jurisdiction under Public Law 280 would apply to Omaha tribal property in South Sioux City.
Public Law 280, as codified at 18 U.S.C. § 1162, gave Nebraska jurisdiction over offenses committed by or against Native Americans in all Indian country within the state. The subsequent federal retrocession statute, codified at 25 U.S.C. § 1323, provides that a Public Law 280 state such as Nebraska can offer to retrocede "all or any measure of the criminal or civil jurisdiction, or both, acquired by such state pursuant to" Public Law 280. (Emphasis supplied.) This means that Nebraska can limit the amount of Public Law 280 jurisdiction it retrocedes to the federal government. In Legislative Resolution 37 the Legislature did just that, limiting the retrocession to criminal jurisdiction only and to Indian country in Thurston County only.
In fact, the United States did not accept all of the jurisdiction offered to be retroceded by Nebraska in 1969 and further limited the retrocession to Omaha Indian country in Thurston County. See, Omaha Tribe of Nebraska v. Village of Walthill, 334 F. Supp. 823, 828 (D. Nebraska 1971), affirmed,460 F.2d 1327 (8th Cir. 1972), cert. denied,409 U.S. 1107. There has been no retrocession of civil or criminal jurisdiction over the Winnebago Reservation in that county.
Because of this 1969 retrocession it is clear that state and local authorities do not have jurisdiction over offenses by or against Native Americans committed within the boundaries of the Omaha Reservation in Thurston County. Federal and tribal authorities have that jurisdiction and responsibility. Outside of Thurston County, however, the state and local authorities would continue to have law enforcement responsibility over tribe-owned land, and state courts would have jurisdiction over crimes committed there.
There is one possible complicating factor. We understand that the Tribe may seek to have the land in South Sioux City held in trust by the United States for the benefit of the Tribe under the terms of a federal statute (25 U.S.C. § 465) or to have it declared to be a reservation under the terms of another federal statute (25 U.S.C. § 467). If the Secretary of the Interior grants either or both of these requests such that the South Sioux City land becomes "Indian country," then it is possible that tribal authorities would have concurrent (i.e., simultaneous) jurisdiction with state and local authorities for criminal law enforcement purposes. The Tribe would be able to enforce its own criminal laws within the boundaries of that land to the same extent that it can do so on the reservation in Thurston County.
With the proper agreements and understandings such concurrent jurisdiction need not be a problem. However, conflicts and confusion can result if all parties do not proceed in good faith.
While state and local authorities and, possibly, tribal authorities would have law enforcement responsibilities on any land owned by or on behalf of the Tribe in South Sioux City, federal authorities would not have that responsibility in light of Public Law 280 which gave whatever criminal jurisdiction the federal government had to the states. Of course, federal authorities would continue to have jurisdiction over federal crimes committed on the tribally-owned land in South Sioux City, just as they have such authority everywhere else.
II. Application of State Gambling Laws
You ask whether Native American tribes in Nebraska are exempt from state gambling laws. We are interpreting your inquiry to refer to those constitutional and statutory provisions which prohibit certain forms of gambling as against public policy and subject those who engage in those forms of gambling to criminal penalties.
Public Law 280 states quite simply that "The criminal laws of [the] State . . . shall have the same force and effect within such Indian country as they have elsewhere within the State." 18 U.S.C. § 1162(a). Thus, it seems clear that, where there has been no retrocession of criminal jurisdiction, the prohibitory criminal gambling laws of Nebraska would be enforceable against Native Americans in Indian country. And, of course, outside of Indian country Native Americans are subject to the same criminal laws as the rest of the citizens of the state. See, F. Cohen, Handbook of Federal Indian Law, 348-49 (1982 ed.); Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-49
(1973).
Therefore, the only remaining question is whether the state's prohibitory criminal gambling laws apply to the Omaha Reservation in Thurston County where criminal jurisdiction has been retroceded. We believe that such criminal laws do apply in retroceded Indian country but that they cannot be enforced by state authorities and that they apply only indirectly by means of federal law enforceable by federal authorities. A section of the Organized Crime Control Act of 1970, 18 U.S.C. § 1955, makes it a federal crime to operate a gambling business that "is a violation of the law of a State . . . in which it is conducted." At least one federal appeals court has said that section 1955 is applicable to Native Americans on reservations even where the state has no Public Law 280 criminal jurisdiction and that such Native Americans can be prosecuted under that federal statutory provision (§ 1955) if their on-reservation gambling business would be in violation of a state criminal law prohibiting such type of gambling. United States v. Farris, 624 F.2d 890 (9th Cir. 1980), cert. denied, 449 U.S. 1111 (1981). Accordingly, under section 1955 it appears that Native Americans on the Omaha Reservation in Thurston County could be prosecuted by federal authorities in federal court if they engaged in gambling activities which are prohibited and made criminal by Nebraska state law.
This interpretation is reinforced by the decision in United States v. Marcyes, 557 F.2d 1361 (9th Cir. 1977), in which the court held that Native Americans could be prosecuted under the federal Assimilative Crimes Act, 18 U.S.C. § 13, for on-reservation sale of fireworks prohibited by Washington State law. While Marcyes involved a different federal statute and fireworks instead of gambling, it does provide support for the proposition that Native Americans on reservations may be prosecuted under federal law for violations of state criminal gambling laws.
Our conclusion, then, is that Native Americans in Nebraska, whether residing within or outside of Indian country and whether residing within or outside an area retroceded to federal jurisdiction, are not exempt from those criminal laws of Nebraska prohibiting certain types of gambling.
As explained at the outset of this letter, however, Indian law is a very complex subject; and even this relatively straightforward conclusion about the applicability of state prohibitory gambling laws must be qualified in at least two ways.
First, there is some question that the state's criminal gambling laws could be applied to gambling activities among Native Americans only on the Omaha Reservation in Thurston County. The Farris case involved casino-type gambling on an Indian Reservation with both Native Americans and non-Indian operators and clientele. And the Marcyes case involved sale of illegal fireworks to non-Indians on a reservation. In Farris the court noted the non-Indian participation as an important ingredient in its decision allowing prosecution of the Native American participants. If only Native Americans are involved, it is less likely that a court would allow state gambling laws to be enforced on a reservation where there has been retrocession of criminal jurisdiction since this would impinge on the tribe's self-determination and its sovereignty over that territory, both of which are strongly protected by federal law and policy.
Second, and most importantly, to the extent that state law may allow certain forms of gambling but merely impose regulations on it (with incidental criminal penalties for violation of the regulatory aspects of the law), such regulatory-type gambling laws are not enforceable in Indian country, whether or not there has been retrocession. It has been made clear by the United States Supreme Court in Bryan v. Itasca County, 426 U.S. 373 (1976), that Public Law 280 does not grant the states any regulatory jurisdiction over Indian country generally other than what they might have under other federal laws. Id. at 388-90. And the federal appellate courts have said that this means state regulatory gambling laws cannot be applied against Native Americans in Indian country even in Public Law 280 states. See, Barona Group of Captain Grande Band, etc. v. Duffy, 694 F.2d 1185
(9th Cir. 1982), cert. denied, 461 U.S. 929 (1983); Seminole Tribe of Florida v. Butterworth, 658 F.2d 310 (5th Cir. 1981), cert. denied, 455 U.S. 1020 (1982). Obviously, if the state does not have regulatory jurisdiction over legal forms of gambling within Indian country where Public Law 280 applies, it certainly does not have such jurisdiction where Public Law 280 does not apply.
It is for this reason that we stated initially that our response to your second question is premised on the assumption that you are referring to Nebraska law prohibiting certain types of gambling as a matter of public policy and making it a criminal violation to engage in such gambling. If state law allows certain types of gambling and merely regulates it (with incidental criminal penalties to enforce the regulatory aspects), then it is likely that this would be deemed a state civil regulatory scheme which may not be enforced in Indian country irrespective of Public Law 280. See, Barona Group, supra; Seminole Tribe, supra. III. Regulation of Native American-Sponsored Bingo
Your third question is whether or not a Native American Tribe operating bingo games outside of Indian country would be subject to the regulations found in the Nebraska Bingo and Pickle Card Regulatory Act, Neb.Rev.Stat. §§ 9-124 et seq. (Reissue 1983 and specifically § 9-148 of the Act. Assuming that the location of the Tribe's bingo operations is outside of a reservation and not on Indian trust land held by the United States, the answer is that these state laws would apply and be enforceable. As pointed out above, outside Indian country Native Americans are generally subject to the same criminal and civil laws as other citizens of the state. See, Mescalero Apache Tribe v. Jones, supra; Puyallup Tribe v. Department of Game, 391 U.S. 392, 398 (1968).
There are, however, two permutations which might occur and which would likely change the above conclusion. First, if the South Sioux City property of the tribe is declared to be a reservation by the Secretary of the Interior pursuant to his authority under 25 U.S.C. § 467, then that land would be "Indian country" and Nebraska's regulatory act concerning bingo would not be enforceable therein. At least two federal courts of appeal and one federal district court have held that state and local laws similar to Nebraska's regulating the conduct of bingo games but not prohibiting the playing of bingo by the general public are not enforceable against Native Americans in Indian country even in Public Law 280 states. Barona Group of Captain Grande Band, etc. v. Duffy, supra; Seminole Tribe of Florida v. Butterworth, supra; Oneida Tribe of Indians v. Wisconsin,518 F. Supp. 712 (W.D. Wisconsin 1981). Thus, it is our opinion that the Nebraska Bingo and Pickle Card Regulatory Act is not enforceable against Native Americans or Native American Tribes conducting bingo operations within Indian country in the state. And, if the Omaha Tribe's land in South Sioux City is declared to be a reservation, then it, too, would be Indian country so that the Act would not be enforceable against the Tribe there either.
We recognize that the Oklahoma Supreme Court has recently held that the state may have jurisdiction to regulate bingo operations within Indian country. Oklahoma v. Seneca-Cayuga Tribe, Supreme Court of Oklahoma, No. 60-074, July 2, 1985. We have reviewed the majority opinion in that case and believe that it is contrary to the weight of federal Indian law as developed over many years and will not be sustained if appealed to the United States Supreme Court. Contrary to the Oklahoma court's conclusion, federal Indian law appears to establish that tribal laws regulating activities within Indian country will generally prevail over conflicting state regulatory statutes. Hence, if tribal bingo operations are regulated by the tribe, state regulations which conflict with tribal regulations will be deemed an impermissible interference with tribal self-government and self-determination as fostered by federal Indian policy. Clearly the subject of state regulation of bingo operations in Indian country is an evolving and volatile area of law. However, our review of the precedents persuades us that unless and until Congress acts to change the law, state regulation of bingo in Indian country which conflicts with tribal regulation will not be permitted.
The second possible scenario is that the Secretary of the Interior will acquire the property in South Sioux City and hold it in trust for the Omaha Tribe without declaring it a reservation, as authorized by 25 U.S.C. § 465. If that were to occur, the question of whether or not the state bingo regulatory act would apply there would turn on a determination of whether such trust land located outside reservation boundaries is "Indian country" in the eyes of the law and under 18 U.S.C. § 1151. Unfortunately, the law in this regard is rather unsettled. See, F. Cohen, Handbook of Federal Indian Law, 45 (1982 ed.).
It appears that such trust lands are considered to be "Indian country" when part of a dependent Native American community or when they are used for the federal purpose of residence and support of Native Americans. Id. Otherwise the status of these outside-of-reservation trust lands is uncertain. In Mescalero Apache Tribe v. Jones, supra, the Supreme Court held that income from a ski resort business operated by a tribe and situated on land outside the reservation leased by the tribe from the Forest Service was subject to state taxes. On the other hand, the court in Cheyenne-Arapahoe Tribes v. Oklahoma, 618 F.2d 665 (10th Cir. 1980), held that lands held in trust for Native Americans on a disestablished reservation were still considered to be "Indian country" such that Oklahoma's hunting and fishing laws could not be applied to Native Americans on such trust lands.
Neither Mescalero Apache Tribe nor Cheyenne-Arapahoe Tribes directly addresses the issue of the status of trust lands outside a reservation used for commercial purposes. Therefore, we do not have an opinion as to whether or not such trust lands would be considered "Indian country" for purposes of eliminating state jurisdiction to regulate bingo operations by a tribe located there. We simply point out the very real possibility that, if the Secretary of the Interior acquires the South Sioux City lots in trust for the Omaha Tribe even without declaring them to be a reservation, they might still be "Indian country" so that the Nebraska Bingo and Pickle Card Regulatory Act can have no effect there. Conclusion
We again caution that Indian law is extremely complex and that there are no simple answers to your inquiries. The outcome in any situation is highly dependent on the unique facts and circumstances of the particular case, so general conclusions may or may not be applicable. With that warning in mind, however, we will summarize our response.
1. As to law enforcement responsibilities, state and local authorities will have criminal jurisdiction over activities on the land owned by the Omaha Tribe in South Sioux City. Depending upon the status of the land (i.e., whether or not it is "Indian country"), tribal authorities may have concurrent law enforcement jurisdiction. Federal authorities will not have law enforcement responsibilities except for purposes of enforcing applicable federal laws.
2. Nebraska's criminal laws prohibiting certain forms of gambling altogether as against public policy are enforceable against Native Americans in Indian country. Where state criminal jurisdiction has been retroceded to the federal government, such state gambling laws are enforceable indirectly by federal authorities under 18 U.S.C. § 1955
which makes it a federal crime to operate a gambling business that is a violation of state law.
3. Nebraska's prohibitory gambling laws may not be enforceable against gambling activities involving only Native Americans on a reservation where criminal jurisdiction has been retroceded.
4. Nebraska's gambling laws which allow certain types of gambling but merely regulate that activity (with incidental criminal penalties to enforce the regulation) are probably not enforceable against Native American tribes in Indian country in the state, whether or not there has been retrocession.
5. The Nebraska Bingo and Pickle Card Regulatory Act is such a regulatory law which allows certain forms of gambling but merely regulates the activity. As such, the Act's provisions are probably not enforceable against Native American tribes conducting bingo operations within Indian country in this state.
6. Depending upon actions taken by the Secretary of the Interior under federal law, lands acquired in South Sioux City by or for the Omaha tribe may be deemed to be "Indian country." If so, the provisions of the Nebraska Bingo and Pickle Card Regulatory Act will probably not be enforceable against the Tribe conducting bingo operations on those lots.
Sincerely,
ROBERT M. SPIRE Attorney General
Charles E. Lowe Assistant Attorney General