UNITED STATES of America, Plaintiff,

v.

Hollis Earl ROBERTS, Defendant.

No. CR–95–35–S.

United States District Court,
E.D. Oklahoma.

Sept. 29, 1995.

John W. Raley, Jr., U.S. Attorney, Linda A. Epperley, Sheldon J. Sperling, Asst. U.S. Attorneys, Muskogee, OK, for Plaintiff.

Burck Bailey, Oklahoma City, OK, Warren F. Bickford, IV, Oklahoma City, OK, Eddie Harper, McAlester, OK, for Defendant.

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

SEAY, Chief Judge.

Defendant, Hollis Earl Roberts ("Roberts"), is charged in an eight-count indictment with five counts of abusive sexual contact in violation of 18 U.S.C. §§ 2242(1), 2244(a)(2) and 2245 [1], two counts of aggravated sexual abuse in violation of 18 U.S.C. §§ 2241(a)(1) and 2245, and one count of sexual abuse in violation of 18 U.S.C. § 2242(1) and 2245. Roberts is an Indian and, at all times material to the charges in the indictment, was the Chief of the Choctaw Nation of Oklahoma ("Choctaw Nation"). The three alleged victims, Angella Jean Gilbert, Misty Grammer and Kobi Dawn Russ, are Indians and were employed by the Choctaw Nation. All offenses allegedly took place within Indian Country.

Before the court for its consideration is Roberts's motion to dismiss the indictment. On September 8, 1995, the court conducted a hearing on this matter and heard the evidence and arguments of the parties with respect to the jurisdictional issue raised by Roberts in his motion. The government presented the testimony of Tom Williams ("Williams"), Director of Real Estate Services for the Choctaw Nation; Glendel Rushing ("Rushing"), Bryan County Assessor;

---

**1.** At the time of the alleged offenses, 18 U.S.C. § 2245 contained definitional provisions applicable to the charges in the indictment. A 1994 statutory change, however, codified the former section 2245 as section 2246. The current version of section 2245 provides for the death penalty or imprisonment for any term of years or for life for sexual abuse resulting in death. On July 14, 1995, the court denied Roberts's motion to strike references to section 2245. The court found no error in the indictment's references to section 2245 as the version in effect at the times of the alleged offenses contained definitions applicable to the charged offenses. *See United States v. Haddock,* 956 F.2d 1534, 1542–43 (10th Cir.), *cert. denied,* 506 U.S. 828, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992).

and Mary Downing ("Downing"), Realty Specialist for the Bureau of Indian Affairs ("BIA"). Roberts presented the testimony of Dennis Springwater ("Springwater"), Acting Deputy Area Director for the BIA.

Roberts contends all counts of the indictment should be dismissed as this court lacks subject matter jurisdiction over the alleged offenses since the alleged criminal acts did not take place within Indian Country. In response, the government contends the court's exercise of jurisdiction over the charged offenses is proper as the criminal conduct occurred at the Choctaw Nation tribal complex, the title to which is held by the United States of America in trust for the Choctaw Nation.[2] The government argues this property qualifies as Indian Country and that this court may properly exercise jurisdiction over the charged offenses. The court agrees with the government.

### I.

The facts which are necessary for a resolution of the jurisdictional issue presented by Roberts's motion are essentially undisputed. The criminal conduct outlined in the indictment allegedly occurred at the Choctaw Nation tribal complex ("tribal complex property"). The tribal complex property is located in Durant, Oklahoma, on real property more particularly described as follows:

A part of Block 18 in West End Heights Addition to the city of Durant, described as follows: Beginning 660 feet East and 200 feet North of the SW corner of said Block 18; thence North 460 feet; thence West 310 feet; thence South 460 feet;

thence East 310 feet to the point of beginning, in Bryan County, State of Oklahoma.

The tribal complex property is the headquarters of the Choctaw Nation. Between sixty and seventy employees are employed by the Choctaw Nation at the headquarters. In addition to the various administrative functions conducted at the headquarters, the Choctaw Nation operates bingo games on the tribal complex property. The Red River Valley Historical Association ("Historical Association") is also located on the tribal complex property. Pursuant to an August 6, 1976, lease agreement (Government's Exhibit No. 8) with the Choctaw Nation, the Historical Association operates its museum and headquarters in buildings located on the tribal complex property.[3]

A review of the chain of title to the tribal complex property since 1975 is helpful in understanding how the Choctaw Nation came to house their headquarters and other operations on the tribal complex property. On April 28, 1975, the United States Marshal for the Eastern District of Oklahoma conveyed the tribal complex property to the Historical Association. (Government's Exhibit No. 4.) On July 19, 1976, the Historical Association conveyed the tribal complex property to the Chamber of Commerce of Durant, Oklahoma ("Chamber of Commerce"). (Government's Exhibit No. 5.) On August 8, 1976, the Chief of the Choctaw Nation requested the United States accept in trust the tribal complex property, then known as the Oklahoma Presbyterian College, located at 16th and Locust in Durant, Oklahoma. (Government's Exhibit A attached to Government's Supplemental Brief.) In connection with this request vari-

---

**2.** Following the filing of Roberts' motion to dismiss, the government moved to dismiss Count VIII of the indictment pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure. On September 6, 1995, the court granted the government's motion. Consequently, Roberts's motion concerns Counts I through VII.

**3.** In response to a proposed expansion by the Historical Association, the Department of Interior, the BIA, and the Choctaw Nation's attorney determined the August 6, 1976, lease agreement was invalid because it was not approved by the Secretary of Interior, or his designee, as required for leases of property held in trust for Indian tribes by the United States under 25 U.S.C. § 415

and implementing regulations found under 25 C.F.R. Part 162, § 162.5. (Government's Exhibits Nos. 13 and 14). However, the Area Director of the BIA withdrew a demand that the Historical Association vacate the premises after Roberts informed the Area Director that he had no objection to the Historical Association continuing to use the tribal complex property. Government's Exhibit No. 15. The Area Director suggested that a new lease be negotiated with the required approval of the Secretary of Interior. Although the record is silent as to any new lease agreement, the Historical Association continues to occupy and use the tribal complex property for the operation of its museum.

ous documentation concerning the transaction was sent to the Superintendent of the Talihina office, who forward the information to the Area Director. On August 11, 1976, the Chamber of Commerce conveyed the tribal complex property to the United States of America in trust for the Choctaw Nation of Oklahoma and such conveyance was recorded with the County Clerk of Bryan County on August 12, 1976. (Government's Exhibit No. 7.) On August 25, 1976, the Area Director of the BIA executed his approval of the acquisition of the tribal complex property in the name of the United States in trust for the Choctaw Nation. (Government's Exhibit No. 10.) This executed approval was attached to the warranty deed, but the approved warranty deed was never filed of record and returned to the BIA. On August 26, 1976, the Area Director sent notification of approval to the Choctaw Nation. Since August 11, 1976, title to the tribal complex property has remained in the United States, in trust for the Choctaw Nation. Both the BIA and the Choctaw Nation have considered the tribal complex property to be trust property since the 1976 acquisition. Also, since 1976, the State of Oklahoma has considered the tribal complex property to be trust land beyond the state's taxation jurisdiction and has therefore not listed it on the state ad valorem tax rolls.

The warranty deed which conveyed title to the United States in trust for the Choctaw Nation contains a provision that title to the subject property is conveyed only for "so long as said premises are used for purposes of the Choctaw Nation of Oklahoma." The warranty deed further provides that:

In the event the property is no longer used by the Choctaw Nation and upon the filing of a Declaration by the Secretary of the Interior that said premises are no longer used by Choctaw Nation, the title shall revert to the Chamber of Commerce of the City of Durant to hold title in trust for the use and benefit of the Red River Valley

Historical Society or other designee of the Chamber of Commerce of the City of Durant.

Roberts contends the creation of this "reversionary interest"[4] in favor of the Chamber of Commerce prevents the tribal complex property from being designated as Indian Country.

## II.

Jurisdiction over the offenses charged in the indictment is premised on the government's contention that the alleged criminal acts occurred within Indian Country. With exceptions not relevant to this case, 18 U.S.C. § 1151 defines Indian Country as:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

The government contends that the tribal complex property qualifies as Indian Country under section 1151 because it is held in trust by the United States for the benefit of the Choctaw Nation.

The United States Supreme Court has determined that land held in trust for the benefit and use of an Indian tribe is Indian Country under section 1151. *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe*, 498 U.S. 505, 511, 111 S.Ct. 905, 910, 112 L.Ed.2d 1112 (1991). In *Potawatomi*, the Supreme Court rejected the argument that Indian Country status depends upon whether the land is denominated "trust land" or "reservation" and focused on whether the land had

---

4. The future interest created under the warranty deed is more appropriately labelled an "executory interest" or "contingent remainder" because it is created subject to a contingency—that the property will not be used for the purposes of the Choctaw Nation. *Jesse Dukeminier and James E.*

*Krier, Property* 435 (1981). A "reversionary interest", on the other hand, is not subject to a condition precedent and "[i]t is a vested interest or estate, in as much as [the] person entitled to it has a fixed right to future enjoyment." *Black's Law Dictionary* 1186 (5th ed. 1979).

been " 'validly set apart for the use of the Indians as such, under the superintendence of the Government.' " *Id.* at 511, 111 S.Ct. at 910 (quoting *United States v. John,* 437 U.S. 634, 649, 98 S.Ct. 2541, 2549, 57 L.Ed.2d 489 (1978)). *See Oklahoma Tax Comm'n v. Chickasaw Nation,* —— U.S. ——, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (Indian Country includes tribal trust land); *Oklahoma Tax Comm'n v. Sac and Fox Nation,* 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993) (presumption against state taxing authority applies to all Indian Country, not just formal reservations); *United States v. McGowan,* 302 U.S. 535, 538–39, 58 S.Ct. 286, 287–88, 82 L.Ed. 410 (1938) (Congressional intent, not designation of property as "reservation" or "colony", controls the determination of Indian Country status); *Indian Country, U.S.A. v. Oklahoma Tax Comm'n,* 829 F.2d 967, 973–76 (10th Cir.1987), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988) (original treaty lands held by tribe under patented fee title were Indian Country even though site was not a "reservation" nor was fee title held by the United States in trust for the tribe); *Cheyenne–Arapaho Tribes v. State of Oklahoma,* 618 F.2d 665, 668 (10th Cir.1980) ("lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a)"); *F. Cohen, Handbook of Federal Indian Law,* 34 (1982 ed.) ("[T]he intent of Congress, as elucidated by [Supreme Court] decisions, was to designate as Indian Country all lands set aside by whatever means for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments.")

The tribal complex property on which the alleged criminal acts took place is clearly tribal trust property. It is undisputed that title to the tribal complex property is held by the United States in trust for the Choctaw Nation. Although Roberts concedes, as he must, that the tribal complex property is so held in trust, he argues that the future interest held by the Chamber of Commerce operates to defeat the trust status designation of the property. Roberts claims the United States does not, and is not capable of, exerting superintending control or jurisdiction over the tribal complex property because the Choctaw Nation retains the unilateral power to control the ownership and title to the tribal complex property. This unilateral power arises from the wording of the future interest contained in the warranty deed which provides that the tribal complex property shall revert to the Chamber of Commerce if the property is not used for the purposes of the Choctaw Nation. It is claimed that this future interest prevents the tribal complex property from being designated as Indian Country.

In support of his argument, Roberts relies on *Buzzard v. Oklahoma Tax Comm'n,* 992 F.2d 1073 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993). In *Buzzard,* the United Keetoowah Band of Cherokee Indians in Oklahoma ("UKB") purchased land and held title to such land in fee simple. The land purchased was subject to a restriction against alienation requiring the approval of the Secretary of the Interior. The Tenth Circuit determined that this land was not Indian Country and was therefore not exempt from state enforcement of tobacco taxing statutes in connection with UKB's smokeshops located on such land. In affirming the district court's determination that UKB was not entitled to injunctive relief prohibiting Oklahoma from enforcing its tobacco taxes, the Tenth Circuit determined the UKB had not established that its smokeshops were "located on land validly set apart for the UKB's use by the federal government." *Id.* at 1076. This determination was influenced by several factors—the land was not trust land, but was owned in fee simple by the UKB; no action had been taken by the federal government indicating that the land was set aside for the UKB's use; and the restriction against alienation requiring approval from the Secretary of Interior was insufficient by itself to indicate that the federal government intended the land to be set aside for the UKB's use under the superintendence of the government. *Id.* at 1076–77. The Tenth Circuit flatly rejected the UKB's argument that its land should be considered Indian Country under section 1151 because it was required, under its charter and federal law, to obtain federal government approval prior to disposing of the land. With respect to this factor concerning re-

striction against alienation, the Tenth Circuit held that the mere fact that the federal government had agreed to approve, or veto, transactions disposing of land did not establish the "sort of active involvement that can be described as superintendence of the land." *Id.* at 1076. Consequently, the Tenth Circuit affirmed the district court's decision that the UKB's land owned in fee simple with a restriction against alienation was not Indian Country.

■ *Buzzard* offers no support for Roberts's position. Contrary to the fee simple ownership by the UKB in *Buzzard,* the tribal complex property in this case is owned by the United States in trust for the Choctaw Nation. *Buzzard* reaffirmed the well-settled rule of law that land held in trust by the United States for the use of an Indian tribe is Indian Country under section 1151. *Id.* at 1076. The inclusion of a future interest which allows the Chamber of Commerce to take title to the tribal complex property upon the fulfillment of a contingency does not alter the trust status of the property. By its very wording, this future interest is contingent in nature—contingent on the land not being used by the Choctaw Nation *and* contingent on the filing of a declaration by the Secretary of Interior that the premises are not being used by the Choctaw Nation—and it cannot operate to defeat an otherwise valid exercise of superintending responsibility by the federal government as established by its approval of an acquisition in trust for the benefit of the Choctaw Nation. The proper focus is on the federal government's superintending role and actions, not on the existence of a contingent property interest possessed by a third party. Any de minimus effect this future interest may have on the federal government's fee ownership in trust is more than overcome by the federal government's undeniable supervisory role as evidenced by the Area Director's approval of the acquisition, the federal government's continued oversight of the tribal complex property, i.e, participation in the 1991 lease dispute between the Choctaw Nation and the Historical Association, and the continued treatment of the tribal complex property as trust property by the BIA and the Choctaw Nation. Consequently, the court rejects Roberts's tortuous interpretation of *Buzzard* and finds that the inclusion of the subject future interest on behalf of the Chamber of Commerce does not defeat the trust status of the tribal complex property, title to which is held by the United States in trust for the Choctaw Nation.

### III.

Roberts also questions whether the tribal complex property was validly set apart for the use of the Choctaw Nation. Roberts claims the federal government failed to comply with its internal policies and procedures for obtaining land in trust. In addition, Roberts argues that the Area Director did not have the authority to approve the acquisition and, therefore, he did not bind the federal government when he gave his written approval of the warranty deed on August 25, 1976. The court finds these arguments without merit.

■ When trust land is acquired, the federal government must take "some action indicating that the land is designated for use by Indians." *Buzzard,* 992 F.2d at 1076. In noting the distinction between trust land and land owned in fee simple by a tribe, the Tenth Circuit in *Buzzard* outlined the procedures followed by the federal government when it acquires land in trust. Among other factors, this process requires a tribe to seek approval of such acquisition with the Secretary, 25 C.F.R. § 151.9, an evaluation by the Secretary of the purpose for which the land will be used, 25 C.F.R. § 151.10(c), an evaluation of the statutory authority for the acquisition and any limitations contained in such authority, 25 C.F.R. § 151.10(a), an evaluation of the impact on the state resulting from the removal of the land from the tax rolls, 25 C.F.R. § 151.10(e), and an evaluation of any jurisdictional problems and potential conflicts of land use which may arise, 25 C.F.R. § 151.10(f).

Although these regulations were not in effect in 1976 when the federal government acquired the tribal complex property in trust for the Choctaw Nation[5], the testimony of

---

**5.** The regulations codified at 25 C.F.R. § 151,11– 151.14 became effective in 1980.

Downing revealed that in 1976 the BIA followed substantially the same procedures as those outlined in regulations currently codified at 25 C.F.R. § 151.1–151.14.[6] (Transcript at 17.) Roberts points to various deficiencies in the transaction process—the transaction was approved after the deed had been executed and filed of record, the approved warranty deed was never filed and returned to the BIA, and the transaction was complete before the BIA ordered a title opinion—and claims the federal government failed to follow the informal procedures when the tribal complex property was purchased in trust in 1976.

■ Even assuming that strict compliance with informal policies and procedures was necessary for a valid acquisition of trust property[7], and Roberts's standing to assert such compliance argument[8], the testimony at the hearing revealed that the federal government substantially complied with the applicable policies and procedures. On August 8, 1976, the Superintendent for the Talihina office of the BIA received a request from the Chief of the Choctaw Nation to accept the tribal complex property in trust. Enclosed with this request were a current abstract, a title opinion from a private attorney, a contract for sale and proposed lease, the Choctaw Nation's statement of the reasons for the acquisition, and other documents related to the transaction. These documents, as well as a title opinion from the field solicitor, were forwarded to the Area Director, who approved the purchase of the tribal complex property in trust for the Choctaw Nation on August 25, 1976. These actions clearly establish compliance with existing policies and procedures and, more importantly, they provide concrete evidence of the active involvement of the federal government in designating the tribal complex property as property for the use of the Choctaw Nation under the superintendence of the federal government. Evidence of post-execution approval by the Area Director and a failure to file and return the approved deed constitute only incidental non-compliance with procedures not affecting the validity of an otherwise proper designation of trust property. Consequently, the court rejects Roberts's contention that the tribal complex property is not Indian Country because of non-compliance with policies and procedures for the acquisition of trust property.

■ Roberts also contends the designation of the tribal complex property as trust property is invalid because the Area Director lacked the authority to approve the transaction. This argument merits little discussion. 25 U.S.C. § 465 vests authority in the Secretary of Interior to purchase land in trust for the purpose of providing land for Indians. In 1946, Congress authorized the Secretary of Interior to delegate his responsibilities concerning the laws governing Indian affairs:

6. Springwater testified that in 1976 there were no procedures for taking land in trust. He stated the Area Director had "pretty broad discretionary authority." (Transcript at 30.)

7. The Eleventh Circuit has rejected a similar challenge to trust transactions based upon a failure to follow formal rules and regulations. In *State of Florida, Department of Business Regulation v. United States Department of the Interior*, 768 F.2d 1248, 1252–53 (11th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986), the Eleventh Circuit held:

We do not consider [the factors listed at 25 C.F.R. § 151.10] to be limits on the Secretary's authority to acquire land for the benefit of Indians. They do not purport to state for what Indian tribe the Secretary may acquire land, or how much land may be acquired, or even the circumstances under which the Secretary may use this authority. Rather they are more precisely labeled as factors to be considered in

exercising discretion. As such, they do not constrain the Secretary's authority to acquire land in trust for Indians. We conclude therefore that appellants have failed to demonstrate that the Secretary exceeded his authority.

The Eleventh Circuit concluded that the federal government's failure to follow proper procedures in acquiring land did not mean that the land in question was not held by the United States for the benefit of the Indian tribe. *Id.* at 1253 n. 5.

8. As argued by the government, it is doubtful that informal policies or procedures confer substantive rights which may be enforced by defendants in criminal actions. *See United States v. Thompson*, 579 F.2d 1184, 1189 (10th Cir.) (en banc), *cert. denied*, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978) (Justice Department's *Petite* policy regarding no federal prosecution following a state prosecution for same transaction is a "housekeeping" provision that is at most a guide for federal prosecutors and it does not confer an enforceable right upon a criminal defendant).

For the purpose of facilitating and simplifying the administration of the laws governing Indian affairs, the Secretary of the Interior is hereby authorized to delegate, from time to time, and to the extent and under such regulations as he deems proper, his powers and duties under said laws to the Commissioner of Indian affairs.... Subject to the supervision and direction of the Secretary, the Commissioner is hereby authorized to delegate, in like manner, any powers and duties so delegated to him by the Secretary, or vested in him by law, to Assistant Commissioners, or the Officer in Charge of any branch, division, office, or agency of the Bureau of Indian Affairs....

Act of August 8, 1946, ch. 907, 60 Stat. 939.

Pursuant to such delegation authority, the Secretary granted a general delegation of his authority to the Commissioner of Indian Affairs:

1. *Delegation.* ... the Commissioner of Indian Affairs is authorized to exercise the authority of the Secretary of the Interior with respect to the management of all Indian affairs and all matters arising out of Indian relations, including the supervision, management, and operation of the Bureau of Indian Affairs and related activities of the Department with respect to Indian program matters.

39 Fed.Reg. 32166–67. This August 28, 1974, general delegation of authority replaced the Secretary's Order 2508 of January 11, 1949, as amended through Amendment Number 104 dated February 28, 1974, which provided authority on an item-by-item basis. *Id.* at 32166.

In 1969, the Commissioner of Indian Affairs had redelegated his authority to the Area Directors as follows:

3.1 *Authorities from the Commissioner.* The authorities of the Secretary of the Interior delegated to the Commissioner in Secretary's Order 2508 (10 BIAM 2) are hereby redelegated to the Area Directors.

This redelegation also includes future authorities of the Secretary of the Interior to the Commissioner ...

34 Fed.Reg. 637–38. With respect to real property management, the redelegation to the Area Directors covered all matters except (1) the approval of leases which provide for a duration in excess of 65 years, inclusive of any provisions for extensions or renewals thereof at the option of the lessee; (2) approval of leases ceded or surplus lands unless title thereto has been restored to the tribe, or the leasing of such lands is authorized by a specific statute; and (3) approval of royalty rates other than as authorized in 25 CFR for oil, gas, and other minerals, except sand, gravel, pumice, and building stone. *Id.*

Thus, the foregoing delegations establish the Area Director's authority to approve the purchase of the tribal complex property in trust for the use of the Choctaw Nation. It is clear that the Secretary of Interior has issued a general delegation of his authority over Indian affairs to the Commissioner of Indian Affairs, who has redelegated his authority to the Area Directors. While the Area Director's authority over real estate management is limited in certain areas concerning leases and royalty rates, it is not limited in the area of trust land purchases. Consequently, the court finds the Area Director possessed the delegated authority to take title to the tribal complex property in trust for the Choctaw Nation in 1976.

## IV.

Based on the foregoing reasons, the court finds that the tribal complex property held in trust by the United States for the Choctaw Nation is Indian Country within the meaning of 18 U.S.C. § 1151. Roberts's motion to dismiss the indictment is therefore denied.

**IT IS SO ORDERED.**