PARKER v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:PARKER v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 PARKER v. STATE
2021 OK CR 17
495 P.3d 653
Case Number: F-2019-247
Decided: 07/15/2021
MICHAEL GARY PARKER, JR., Appellant v. STATE OF OKLAHOMA, Appellee.
Cite as: 2021 OK CR 17, 495 P.3d 653

 

 

O P I N I O N

ROWLAND, VICE-PRESIDING JUDGE:

¶1 Appellant Michael Gary Parker, Jr. appeals his Judgment and Sentence from the District Court of Tulsa County, Case No. CF-2018-3184, for First Degree Manslaughter, in violation of 21 O.S.2011, § 711.[1] Parker's jury unanimously found him guilty, but deadlocked on the issue of punishment. The Honorable William J. Musseman, Jr., District Judge, who presided over Parker's jury trial, sentenced Parker to twenty years imprisonment, with seventeen years to be served in prison and the remaining three years suspended with supervised probation.[2] Parker raises seven claims on appeal:

(1) whether his conviction must be reversed because the State failed to prove beyond a reasonable doubt that he was not acting in self-defense;

(2) whether the district court erred by submitting a first degree manslaughter instruction over his objection;

(3) whether he was denied an impartial jury;

(4) whether the district court erred by denying his motion to suppress and admitting his confession at trial;

(5) whether prosecutorial misconduct deprived him of a fair trial;

(6) whether he received the effective assistance of trial counsel; and

(7) whether the district court had jurisdiction of this matter.

We affirm the Judgment and Sentence of the district court.

Facts

¶2 On July 22, 2018, Parker fatally shot John Wilson outside a Tulsa after-hours club. The two were not acquainted, but had been involved in an altercation at a different club, the 007 Club, earlier that evening. The prosecution theorized that Parker, angry and upset over his altercation with Wilson, went home, armed himself, drove to the after-hours club, and intentionally shot Wilson who, though armed, was not acting in a threatening manner. Two witnesses to the shooting testified Wilson was not acting in a threatening manner and the shooter targeted him.

¶3 Parker, on the other hand, insisted that he acted in self-defense. He claimed after his altercation with Wilson at the 007 Club, he had his cousin, Patrick Tolon, take him home because he was upset. On the way, he reluctantly agreed to accompany Patrick and their cousin, Roosevelt Tolon, to an after-hours spot. Parker grabbed his handgun from his home for protection and drove himself to the after-hours club because his cousins were convicted felons and were not permitted to be in cars with firearms. Parker, who claimed he did not anticipate seeing Wilson again that evening, glimpsed Wilson just after his arrival at the after-hours club. Parker testified that Wilson began approaching and cussing him in the club parking lot. Parker said Wilson reached for his pocket and Parker assumed he was going for the gun he had seen Wilson with earlier. Parker drew his own gun from his waistband and fired four shots, killing Wilson. The issue at trial was whether Parker shot Wilson with malice aforethought, in a heat of passion, or in self-defense. Additional facts will be discussed in relation to the propositions raised for review.

1. Sufficiency of the Evidence

¶4 Parker argues his First Degree Manslaughter conviction must be reversed and dismissed for insufficient evidence. He contends the prosecution failed to prove beyond a reasonable doubt that he did not act in self-defense. We disagree.

¶5 Evidence is sufficient to support a conviction if, viewing the evidence and all reasonable inferences from it in the light most favorable to the State, any rational trier of fact could find the defendant guilty beyond a reasonable doubt. Mason v. State, 2018 OK CR 37, ¶ 13, 433 P.3d 1264, 1269; Spuehler v. State, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-04. This Court does not reweigh conflicting evidence or second-guess the fact-finding decisions of the jury; we accept all reasonable inferences and credibility choices that tend to support the verdict. Mason, 2018 OK CR 37, ¶ 13, 433 P.3d at 1269. We further recognize that the law makes no distinction between direct and circumstantial evidence and either, or any combination of the two, may be sufficient to support a conviction. Id. We examine pieces of evidence together in context rather than in isolation, and we will affirm a conviction so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded the defendant was guilty beyond a reasonable doubt. Id.

¶6 A person is entitled to use deadly force to defend himself or herself "when the person using force reasonably believes such force is necessary to prevent death or great bodily harm to himself or herself or another or to terminate or prevent the commission of a forcible felony." 21 O.S.Supp.2014, § 733(A)(2). Self-defense is an affirmative defense in which the defendant necessarily admits the elements of the charged homicide crime, but offers a legal justification for the fatal conduct. McHam v. State, 2005 OK CR 28, ¶ 10, 126 P.3d 662, 667. Parker maintained in his police interview and during his trial testimony that he shot the victim in self-defense. Based on the evidence, the district court properly submitted the issue of self-defense to the jury and instructed the jury on the State's burden to disprove self-defense beyond a reasonable doubt. See id. 

¶7 The trial evidence, viewed in the light most favorable to the prosecution, sufficiently proved beyond a reasonable doubt that Parker did not act in self-defense. Two witnesses to the shooting contradicted Parker's self-defense account. These eyewitnesses neither heard the victim make any threats nor saw the victim make any kind of threatening movements before Parker shot him. A rational jury could find, based on the evidence, that Parker's self-defense claim was unworthy of belief because any belief that deadly force was necessary to prevent death or great bodily harm was unreasonable under the circumstances. Because the evidence was sufficient to disprove Parker's claim of self-defense, his conviction may stand. This claim is denied.

2. Jury Instructions

¶8 Parker claims the district court erred by instructing his jury on first degree manslaughter, over his objection, because there was no evidence to support the conclusion that he shot the victim in a heat of passion. He maintains submission of the unsupported lesser included offense encouraged the jury to reach a compromise verdict. We review the district court's decision to submit a first degree manslaughter instruction for an abuse of discretion. Davis v. State, 2018 OK CR 7, ¶ 7, 419 P.3d 271, 277. This Court finds an abuse of discretion only where the district court's decision is unreasonable or arbitrary and was made without proper consideration of the relevant facts and law. Bramlett v. State, 2018 OK CR 19, ¶ 19, 422 P.3d 788, 795. This claim is without merit.

¶9 The record shows the district court explained, during a jury instruction conference, that generic imperfect self-defense is not a recognized defense and cited Mack v. State, 2018 OK CR 30, ¶ 5, 428 P.3d 326, 328. Although case law does not recognize imperfect self-defense as a separate defense, the district court concluded that this Court's prior cases establish that some form of manslaughter instruction may be appropriate where a self-defense claim fails but the evidence establishes conditions satisfying the elements of manslaughter. Id., 2018 OK CR 30, ¶ 5, 428 P.3d at 328-29. The district court went on to outline three plausible views of the trial evidence, the first two of which were premeditated murder and classic self-defense. The third plausible view of the evidence, according to the district court, was that Parker acted in a heat of passion when he unexpectedly saw the victim again at the after-hours club and that he was overcome with emotion and fear from their earlier encounter, causing him to perceive the victim's movements as a threat, although the threat was not real and his perception was unreasonable.

¶10 The district court's analysis of the trial evidence was fair and supported by the record. Parker's contention that the evidence was insufficient to show the existence of any passion, fear, or anger at the time of the shooting from his and the victim's earlier encounter was but one view of the evidence which does not negate other reasonable interpretations. We find, based on the evidence, that the district court did not abuse its discretion in submitting a first degree manslaughter instruction. Accordingly, this claim is denied.

3. Impartial Jury

¶11 Parker claims he was denied a fair trial and impartial jury because the prosecution removed all three African-American male panelists from the venire with peremptory challenges without demonstrating adequate race-neutral reasons for their removal. Batson v. Kentucky, 476 U.S. 79, 89 (1986) (holding the government may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial).[3] Parker contends the district court failed to sufficiently consider whether the race-neutral reasons offered by the prosecutor were in fact a pretext for discrimination. We review the district court's Batson rulings for an abuse of discretion. Grant v. State, 2009 OK CR 11, ¶ 26, 205 P.3d 1, 14.

¶12 The Court has set forth the applicable analysis of a Batson claim, stating:

Batson establishes a three-part inquiry. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Generally, he does this by simply objecting to the removal and pointing out the apparent race of the panelist. Once he does so, the burden shifts to the prosecutor to articulate a clear, reasonably specific, and race-neutral explanation for striking the panelist. That explanation need not be particularly persuasive; it must only be race-neutral, and will be deemed so unless a discriminatory intent is inherent in the answer. Once a facially race-neutral explanation is given, the opponent of the strike bears the burden of proving discriminatory intent.

Grant, 2009 OK CR 11, ¶ 26, 205 P.3d at 14.

¶13 Parker challenges the prosecution's peremptory challenges of D.J., R.W., and J.Y., the three African-American male panelists on the venire. Defense counsel objected, based on Batson, to the removal of these panelists and the prosecutor offered race-neutral reasons. See Smith v. State, 2007 OK CR 16, ¶ 12, 157 P.3d 1155, 1162 (holding "[a] neutral explanation in the context of this analysis means one based on something other than race of the juror."). The purported reasons for striking these three panelists involved their attitudes toward, and trust/distrust of, law enforcement and their own, or their families', previous contacts with law enforcement and the criminal justice system. The prosecutor's reasons showed no discriminatory intent inherent in the explanation. Thus, the reasons given were race-neutral. Id. The State's race-neutral explanations for striking the panelists shifted the burden to Parker to prove purposeful discrimination. Id., 2007 OK CR 16, ¶ 16, 157 P.3d at 1163.

¶14 The Court in Flowers v. Mississippi explained the trial judge's role in evaluating race-neutral justifications:

The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties. The trial judge's assessment of the prosecutor's credibility is often important. The Court has explained that "the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." "We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province." The trial judge must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race. The ultimate inquiry is whether the State was "motivated in substantial part by discriminatory intent."

139 S.Ct. 2228, 2243-44 (2019) (citations omitted).

¶15 The district court observed that the prosecution had struck three African-American males in the venire. The district court stated it "hate[d] to weigh in on telling parties how to exercise their challenges" but understood its role to "look at the record for race-neutral reasons to strike someone." The prosecutor's claim that he put "a lot of stock" in the panelist's trust rating of police is borne out by the record. With the exception of one challenge, the prosecution used eight of its nine peremptory challenges to strike panelists who rated their trust of police at 6.5 out of 10 or lower, including the three African-American panelists. Although not dispositive, the record shows there was an African-American female who served, without challenge, on Parker's jury. The district court, observing voir dire and judging the credibility of the prosecutor, found no discriminatory intent in the peremptory strikes. Given the deference afforded a district court's decision on a Batson claim, we find the district court's decision--to accept the race-neutral reasons as sufficient to defeat Parker's Batson challenge--was not clearly erroneous. Id. at 2244; Snyder v. Louisiana, 552 U.S. 472, 477, (2008) (holding "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."). Because the district court did not err in finding no purposeful discrimination in the removal of the three panelists, we reject this claim.

4. Motion to Suppress

¶16 Parker argues the district court denied his motion to suppress and admitted his confession in error.[4] He maintains the detective did not scrupulously honor his invocation of his right to counsel and coerced his statement by threatening to arrest his girlfriend.[5] The district court conducted a Jackson v. Denno hearing[6] to consider the voluntariness of Parker's custodial statement and held his confession was voluntary and admissible. Parker did not object to the admission of his confession at trial. He has therefore waived appellate review of this issue for all but plain error. See Mason, 2018 OK CR 37, ¶ 16, 433 P.3d at 1270. He has the burden in plain error review to demonstrate: 1) the existence of an actual error (i.e., deviation from a legal rule); 2) that the error was plain or obvious; and 3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding. Hogan v. State, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923. Even where this showing is made, this Court will correct plain error only where the error seriously affected the fairness, integrity or public reputation of the judicial proceedings or represented a miscarriage of justice. Id.; 20 O.S.2011, § 3001.1. Because the district court did not err in its ruling, Parker is not entitled to relief for plain error. See Hogan, 2006 OK CR 19, ¶ 39, 139 P.3d at 923 (stating "[t]he first step in plain error analysis is to determine whether error occurred").

¶17 When a suspect unambiguously invokes his or her right to counsel, questioning must cease and police may not resume interrogation of the suspect until the suspect reinitiates further communication or conversations with police or the suspect's attorney is physically present during the interrogation. Minnick v. Mississippi, 498 U.S. 146, 156 (1990); Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Accordingly, to admit a suspect's statement made after he or she has invoked the right to counsel, the State must show both that the suspect reinitiated discussions with police and that the suspect knowingly and intelligently waived the right previously invoked.

¶18 It was undisputed that the detective advised Parker of his constitutional rights and that Parker invoked his right to counsel ending the first interview. According to the detective, he ceased questioning after Parker invoked his right to counsel. The detective re-entered the interview room later to hand Parker a business card so once Parker had an attorney, he would have the detective's contact information and he could make a statement if he chose to do so. The detective said Parker became emotional and said he wanted to make a statement. The detective stopped Parker, turned the recording equipment on, and obtained Parker's waiver of his rights. The detective was firm that he did not threaten Parker to obtain his statement in the second interview. Parker claimed, however, that when the detective came in to hand him the business card, the detective threatened to arrest his girlfriend which caused him to waive his rights and confess.

¶19 After reviewing the videotape of the interview and considering the testimony of both the detective and Parker, the district court found that Parker reinitiated contact with the detective and knowingly and voluntarily waived his rights. The district court explained that it found quite credible the detective's testimony that he did not threaten Parker. The court also found that Parker's demeanor during the interview was inconsistent with his assertion he had been threatened and coerced. These findings are supported by the record. For these reasons, we find that the district court did not err in denying Parker's motion to suppress and that relief is not warranted. This claim is denied.

5. Prosecutorial Misconduct

¶20 Parker argues he was denied a fair trial because of prosecutorial misconduct. He claims the prosecutor improperly shifted the burden of proof, mischaracterized the evidence, and improperly argued that he tailored his defense to the trial testimony. Parker's objections to the challenged remarks below preserved this claim for appellate review. This Court will not grant relief on a claim of prosecutorial misconduct unless the misconduct effectively deprived the defendant of a fair trial or a fair and reliable sentencing proceeding. Harmon v. State, 2011 OK CR 6, ¶ 80, 248 P.3d 918, 943. We evaluate claims of prosecutorial error "within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel." Lee v. State, 2018 OK CR 14, ¶ 6, 422 P.3d 782, 785. We have long recognized that both parties enjoy a "wide latitude in closing argument to argue the evidence and reasonable inferences from it." Lamar v. State, 2018 OK CR 8, ¶ 54, 419 P.3d 283, 297.

¶21 Parker testified that he told his girlfriend everything that happened after the shooting. The prosecutor asked, during cross-examination, about her ability to confirm Parker's statements as well as Parker's ability to call her as a witness. The district court sustained each of defense counsel's objections. The prosecutor later asked Parker about producing a witness to verify his account of the shooting and what he claimed the victim had said. The district court sustained defense counsel's objection and admonished the jury to disregard the prosecutor's question and reminded the jury that the State had the burden of proof and it never shifted. During closing argument, the prosecutor argued that jurors did not know "exactly" what was said between Parker and the victim in their encounters and that "[t]he only version" was provided by Parker, "[a]nd, once again, we can't trust it." The district court, without comment, sustained defense counsel's objection.

¶22 A prosecutor may comment on a defendant's access to evidence and witnesses without impermissibly shifting the burden of proof. Pickens v. State, 2001 OK CR 3, ¶ 39, 19 P.3d 866, 880. See also Bernard v. State, 1975 OK CR 145, ¶ 10, 538 P.2d 1109, 1112 (stating where a person might be a material witness in defendant's behalf, and the witness is not placed upon the stand by the accused, nor his absence accounted for, failure to produce him as a witness is a legitimate matter for comment in the prosecution's argument). Prosecutors, however, may not comment regarding the conclusions to be drawn from a defendant's failure to call a particular witness. Thomas v. State, 1991 OK CR 58, ¶ 24, 811 P.2d 1337, 1344. We need not parse the prosecutor's challenged questions and statements because we have held that "[e]rror is cured where a defendant's objection to improper argument is sustained." Mack v. State, 2008 OK CR 23, ¶ 9, 188 P.3d 1284, 1289. Not only did the district court halt the prosecutor's challenged statements, the court properly instructed the jury from the beginning that argument by the attorneys was not evidence. More importantly, the court submitted accurate instructions on the burden of proof throughout trial. The district court's action ending the prosecutor's questions and argument coupled with its accurate opening and closing instructions and interim admonition on the burden of proof remedied any possible error.

¶23 Parker argues the prosecutor's reference to the shooting as an "assassination" and an "execution" mischaracterized the evidence and inflamed the passions and prejudices of the jury. The district court did not err in overruling defense counsel's objections because the remarks, read in context, fall within the wide latitude the parties have to discuss and argue the evidence. Nor does the record support Parker's contention that the remarks inflamed the jury as his jury rejected the prosecutor's contention that the shooting was premeditated. No relief is required.

¶24 Lastly, Parker argues the prosecutor made improper comments inviting the jury to draw the inference that he concocted his testimony to fit the necessary elements of his defense after listening to the trial evidence. The district court overruled defense counsel's objection to the prosecutor's argument concerning Parker's tailoring of testimony.

¶25 Parker maintains the prosecutor's argument unfairly burdened the exercise of his right to be present during trial and denied him a fair trial. Parker acknowledges that the Supreme Court, as well as this Court, have rejected similar claims. Portuondo v. Agard, 529 U.S. 61, 73 (2000); Hooks v. State, 2001 OK CR 1, ¶ 43, 19 P.3d 294, 315. He asks us to reconsider our stance in light of the dissent in Agard and the opinion of two courts from other states that have found such argument improper. The prosecutor's argument concerning tailoring testimony was not error under Agard and the argument challenged here does not provide compelling reasons to reconsider our position in this case. Parker also cites as error the prosecutor's characterization of his testimony as "self-serving" and the prosecutor's argument that Parker was trying to use "magic" words to escape responsibility. The district court sustained Parker's objections related to these latter comments, halted the challenged argument, and properly instructed the jury on the law, curing any error. This claim warrants no relief and is denied.

6. Ineffective Assistance of Counsel

¶26 Parker claims he is entitled to relief because of ineffective assistance of trial counsel. He faults defense counsel for failing to renew the motion to suppress his confession at trial and for failing to use available evidence to support his defense. This claim requires no relief.

¶27 This Court reviews claims of ineffective assistance of counsel to determine: (1) whether counsel's performance was constitutionally deficient; and (2) whether counsel's performance prejudiced the defense so as to deprive the defendant of a fair trial with reliable results. Strickland v. Washington, 466 U.S. 668, 687 (1984); Malone v. State, 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206. This Court need not determine whether counsel's performance was deficient if there is no showing of harm. See Malone, 2013 OK CR 1, ¶ 16, 293 P.3d at 207. The merit of the underlying claim involving Parker's motion to suppress has been considered and rejected in Proposition 4. Because the district court did not err in denying his suppression motion, Parker cannot show prejudice resulting from defense counsel's failure to renew it during trial.

¶28 Parker also claims defense counsel was ineffective for failing to call his cousin as a defense witness to support his self-defense claim. He asks this Court for an evidentiary hearing to develop this claim. The sole attachment to the motion is an affidavit from an investigator in appellate counsel's office, detailing the anticipated testimony Parker's cousin would provide at an evidentiary hearing. This Court will order an evidentiary hearing only if "the application and affidavits . . . contain sufficient information to show this Court by clear and convincing evidence [that] there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2021). Where nothing in the supplemental materials alters or amplifies in any compelling way the portrait which emerged from the testimony at trial, this Court will find the materials fail to establish by clear and convincing evidence a strong possibility that trial counsel was ineffective. Sanchez v. State, 2009 OK CR 31, ¶ 104, 223 P.3d 980, 1013.

¶29 Parker's defense at trial was self-defense. He claimed self-defense during both his police interview and trial testimony. It is clear from the record that defense counsel was well aware of Parker's cousin's proposed testimony and considered calling him as a witness to support Parker's defense.[7] After the prosecution rested and the district court denied Parker's demurrer, defense counsel stated that she anticipated calling Parker's cousin the following morning. She noted that Parker's cousin was being held in the county jail and that she was working with his lawyer to obtain clothes. The next day, however, defense counsel called only Parker. Defense counsel obviously re-evaluated the witness's value and credibility overnight, considering not only his present legal difficulties but also his former convictions. Defense counsel analyzed the risk verses the reward of having him testify in Parker's case and elected to support Parker's claim of self-defense with Parker's testimony alone. Defense counsel's action may be easily attributed to trial strategy. See Bench v. State, 2018 OK CR 31, ¶ 198, 431 P.3d 929, 976 (stating which witnesses to call on a criminal defendant's behalf is a matter of trial strategy); Lee, 2018 OK CR 14, ¶ 14, 422 P.3d at 786 (stating court will not second-guess matters of trial strategy if there is a reasonable basis for counsel's actions).

¶30 Having reviewed Parker's Request for an Evidentiary Hearing and the affidavit offered to support his request, we find that he has failed to meet his burden as he has not shown a strong possibility that defense counsel was ineffective for failing to call his cousin. Rule 3.11, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2021). Parker is not entitled to an evidentiary hearing to further develop his ineffective assistance of counsel allegations, and his motion, as well as this claim, are denied. See Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06.

7. Jurisdiction

¶31 Parker contends that because he is eligible to become a citizen of the Cherokee Nation and the charged crime occurred in Indian country, his case must be dismissed for lack of jurisdiction under McGirt v. Oklahoma, 591 U.S.___, 140 S.Ct. 2452 (2020). In McGirt, the Supreme Court held that land set aside for the Muscogee Creek Nation in the nineteenth century was intended by Congress to be an Indian reservation, and that this reservation remains in existence today for purposes of federal criminal law because Congress has never explicitly disestablished it. Accordingly, Oklahoma lacked jurisdiction to prosecute McGirt, an Indian, because he committed his crimes on the Creek Reservation, i.e. in Indian country, and it is the federal government that has jurisdiction of such criminal matters under the Major Crimes Act (MCA), 18 U.S.C. § 1153. We granted Parker's request to file a supplemental brief raising a jurisdictional challenge in light of McGirt and remanded the matter to the district court to conduct an evidentiary hearing to determine: (1) Parker's Indian status; and (2) whether the crime occurred in Indian country pursuant to United States v. Diaz, 679 F.3d 1183, 1187 (10th Cir. 2012); United States v. Prentiss, 273 F.3d 1277, 1280 (10th Cir. 2001); Goforth v. State, 1982 OK CR 48, ¶ 6, 644 P.2d 114, 116.

¶32 This claim turns on the district court's resolution of the first question, namely Parker's Indian status.[8] Parker had the burden to prove he is an Indian by producing prima facie evidence that he has some Indian blood and that he was recognized as an Indian by a tribe or the federal government. See State v. Klindt, 1989 OK CR 75, ¶ 5, 782 P.2d 401,403 (holding a defendant has the burden to prove his or her Indian status for dismissal based on lack of jurisdiction). To meet his burden, Parker, who descends from Cherokee Freedmen, advised the district court at an October 15, 2020 status conference that he would be seeking a continuance to conduct DNA testing in an effort to secure evidence to satisfy the "some degree of Indian blood" prong of the Indian status test.[9] The State objected, arguing a continuance was unnecessary because Parker could not show he was recognized as Indian by a tribe or the federal government at the time he committed the offense. The district court elected to postpone consideration of Parker's request for DNA testing until it heard evidence and ruled on whether Parker could satisfy the recognition prong of the Indian status test.

¶33 The parties appeared for an evidentiary hearing two weeks later to address the recognition prong. The district court accepted written stipulations from the parties and admitted Parker's Exhibits A-L over limited objection.[10] After listening to the parties' arguments, the district court found that Parker failed to show through his admitted exhibits that he was recognized by a federally recognized Indian tribe, namely the Cherokees, or the federal government. The court further found that Parker's failure to present prima facie evidence of his Indian recognition made further litigation on the issue of his blood quantum moot. The district court issued written Findings of Fact and Conclusions of Law, memorializing its narrow ruling, stating:

1. Finds that the defendant was not recognized as an Indian by a federally-recognized Indian tribe or the federal government at the time of the offense, or at the time of hearing;

2. Finds that the defendant fails to set forth prima facie evidence of his legal status as an Indian for the purposes of Indian Country jurisdiction; and 

3. Concludes that the defendant is not an Indian for the purposes of Indian Country Jurisdiction, pursuant to Diaz, Prentiss, and Goforth.[11]

 

¶34 We afford a district court's factual findings that are supported by the record great deference and review those findings for an abuse of discretion. Young v. State, 2000 OK CR 17, ¶ 109, 12 P.3d 20, 48. We decide the correctness of legal conclusions based on those facts without deference. See Gomez v. State, 2007 OK CR 33, ¶ 5, 168 P.3d 1139, 1141-42 (reviewing a trial court's ruling on a motion to suppress evidence based on a complaint of an illegal search and seizure with deference to the trial court's factual findings unless not supported by competent evidence and a trial court's legal conclusions based on those facts de novo); Salazar v. State, 2005 OK CR 24, ¶ 19, 126 P.3d 625, 630 (giving district court's factual findings strong deference, but deciding without deference ultimate claim of trial counsel effectiveness).

 

¶35 A defendant's Indian status or that of a crime victim is an essential element of an MCA offense and must be proved by the prosecution in order to have federal jurisdiction over crimes committed by or against Indians in Indian Country. As the United States Court of Appeals for the Tenth Circuit has explained:

The term "Indian" is "not defined in . . . statutes addressing criminal jurisdiction in Indian country," so we have adopted a two-part evidentiary test to determine whether a person is an Indian for the purposes of federal law. To find that a person is an Indian the court must first make factual findings that the person has "some Indian blood" and, second, that the person is "recognized as an Indian by a tribe or by the federal government." A person satisfies the definition only if both parts are met; conversely the government can prove that a person is not Indian by showing that he fails either prong. This test, moreover, applies to determine the status of both a perpetrator or a victim of a crime in Indian Country.

Diaz, 679 F.3d at 1187 (citations omitted). See also Prentiss, 273 F.3d at 1280; Goforth, 1982 OK CR 48, ¶ 6, 644 P.2d at 116. This Court applies the same Indian status test used by the Tenth Circuit, our federal circuit.

¶36 It is settled law that a person may be an Indian for purposes of federal criminal jurisdiction even if he or she is not formally enrolled in any tribe. See United States v. Bruce, 394 F.3d 1215, 1224-25 (9th Cir. 2005) (citing numerous cases holding that lack of enrollment is not determinative of recognition); United States v. Drewry, 365 F.3d 957, 961 (10th Cir. 2004), vacated on other grounds by Drewry v. United States, 543 U.S. 1103 (2005) (affirming tribal enrollment is not the only way to prove a person is Indian for federal criminal jurisdiction); St. Cloud v. United States, 702 F.Supp. 1456, 1461 (D.S.D. 1988) (accepting a person may still be an Indian though not enrolled with a recognized tribe). Nevertheless, he or she must still show that at the time of the offense, he or she was recognized as an Indian by a tribe or by the federal government. This is often done through production of his or her tribal membership documents/card showing that individual as a member of a particular tribe. Diaz, 679 F.3d at 1187.[12] Recognition might also be proved through a Certificate Degree of Indian Blood card (CDIB) showing the defendant's blood quantum. Id.

¶37 Parker, of course, presented no evidence of his tribal membership since he is not yet a member of the Cherokee Nation.[13] Instead he presented evidence of his descent from Cherokee Freedmen as well as evidence of the complex history between the Freedmen and the Cherokee Nation. He contended this complex relationship accounted for his inability to present customary evidence of recognition. He advocated that recognition should be based on membership eligibility alone. Because his ancestry demonstrated a long-term familial affiliation with the Cherokee Nation, he maintained that this affiliation should be sufficient for recognition despite his personal lack of tribal enrollment or affiliation. Conversely, the State argued that recognition should be based exclusively on whether or not the person in question was enrolled in a federally recognized tribe at the time of the offense. The State maintained this bright-line rule is easy to apply, is necessary to avoid any notice issues, and is necessary to avoid any jurisdictional gap issue between the state and federal government.[14]

 

¶38 Despite his ongoing effort to obtain membership, the district court found that Parker was not an Indian because he could not show the Cherokees recognized him as Indian either at the time of the crime or at the evidentiary hearing. Although it accepted Parker's evidence of his descent from Cherokee Freedmen, the district court was unaware of any precedent in Oklahoma or the Tenth Circuit providing a criminal defendant's eligibility alone for tribal membership qualified him or her as an Indian for purposes of Indian Country jurisdiction. Diaz, Prentiss, and Goforth, supra. 

 

¶39 Parker contends that being Indian is a binary, immutable state; one either is Indian or is not regardless of tribal membership. Thus, he maintains that the district court abused its discretion when it rejected his contention that evidence of his tribal eligibility coupled with evidence of his strong ancestral ties to the Cherokee Nation was sufficient to meet the recognition prong. His assertion is correct as a matter of racial fact, but is wrong as a matter of law, because the term "Indian" has a specific meaning within the ambit of federal criminal jurisdiction, one that includes both racial and political components of the Indian community.

¶40 While we have not had occasion to adopt factors to consider in determining recognition, the Tenth Circuit and other courts have identified four core factors, namely:

1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life.

Bruce, 394 F.3d at 1224; Drewry, 365 F.3d at 961.[15] Parker's proof or lack thereof supporting recognition prompted the district court to observe that he had no evidence of participation in any type of cultural or social events with the Cherokee Nation or receipt of tribal services through family members. The district court noted that Parker's "familial affiliation with the Cherokee Nation appears to be a (sic) more of a recent discovery rather than a long-known cornerstone of [his] identity." It went on to reject Parker's claim that the complex relationship between the Cherokee Nation and Freedmen was responsible for his inability to present relevant evidence of recognition. The court ultimately refused to apply a different standard other than the prevailing law whose factors outline the commonly accepted proof establishing recognition.

¶41 In addressing recognition, the court in St. Cloud explained:

Indian blood alone is not enough to warrant federal criminal jurisdiction because jurisdiction over Indians in Indian country does not derive from a racial classification but from the special status of a formerly sovereign people. United States v. Antelope, 430 U.S. 641, 646, 97 S.Ct. 1395, 1398--99, 51 L.Ed.2d 701 (1977); F. Cohen, Handbook of Federal Indian Law 19 (1982 ed.). The second prong of the Rogers test in essence probes whether the Native American has a sufficient non-racial link to a formerly sovereign people.

St. Cloud, 702 F. Supp. at 1461.

¶42 We agree, as the district court stated, that Parker's family history is intertwined with the Cherokee experience. Nevertheless, our examination of the record, like the district court's review, reveals that Parker presented no evidence of a link between himself and the Cherokee Nation. His tribal identity was not part of his upbringing and he did not participate in or affiliate with the tribe in any way until now.[16] The test is whether a tribe recognized the defendant as Indian and here the answer is no. The primary factors courts examine for recognition personally link a defendant to a particular tribe. We find Parker's proof--consisting of evidence of descent from relatives enrolled in the Cherokee Nation long ago--is insufficient to satisfy the recognition prong of the Indian status test. We therefore hold the district court correctly applied controlling law and adopt its ruling.

DECISION

¶43 The Judgment and Sentence of the district court is AFFIRMED. Parker's Application for Evidentiary Hearing on Sixth Amendment Claim is DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2021), the MANDATE is ORDERED issued upon delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY,
THE HONORABLE WILLIAM J. MUSSEMAN, JR.
DISTRICT JUDGE

 
 
 
 APPEARANCES AT TRIAL
 
 
 APPEARANCES ON APPEAL
 
 
 
 
  
 
 
  
 
 
 
 
 BEVERLY ATTEBERRY
 ATTORNEY AT LAW
 1815 EAST 15TH ST.
 TULSA, OK 74104
 COUNSEL FOR DEFENDANT
 
 
 JAMIE D. PYBAS
 DIVISION CHIEF
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR APPELLANT
 
 
 
 
  
 
 
  
 
 
 
 
 MARK COLLIER
 JOHN TJEERDSMA
 ASST. DISTRICT ATTORNEYS
 500 S. DENVER, SUITE 900
 TULSA, OK 74103
 COUNSEL FOR STATE
 
 
 MIKE HUNTER
 ATTY. GENERAL OF OKLAHOMA
 THEODORE M. PEEPER
 ASST. ATTORNEY GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 
 
 
  
 
 
  
 
 
 
 
 APPEARANCES ON REMAND
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 JAMIE D. PYBAS
 DIVISION CHIEF
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR DEFENDANT/APPELLANT
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 MIKE HUNTER
 ATTY. GENERAL OF OKLAHOMA
 RANDALL YOUNG
 ASST. ATTORNEY GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR STATE
 
 
  
 
 
 

 

OPINION BY: ROWLAND, V.P.J.
KUEHN, P.J.: Concur in Results
LUMPKIN, J.: Concur
LEWIS, J.: Concur in Results
HUDSON, J.: Concur

FOOTNOTES

[1] The State charged Parker with First Degree Murder, but the jury found him guilty of the lesser included offense.

[2] Under 21 O.S.Supp.2015, § 13.1, Parker must serve 85% of his sentence of imprisonment before he is eligible for parole consideration.

[3] Flowers v. Mississippi, 139 S.Ct. 2228, 2242 (2019) (stating "even a single instance of race discrimination against a prospective juror is impermissible").

[4] Parker admitted in his interview that he shot the victim, but maintained he acted in self-defense.

[5] Parker testified at the Jackson v. Denno hearing that the detective made statements indicating his fiancé would be arrested and his children put in state custody.

[6] 378 U.S. 368 (1964) (establishing a defendant's right to a hearing on the voluntariness of his inculpatory statements or confession).

[7] The investigator stated that Parker's cousin spoke with defense counsel prior to trial and counsel said she might call him as a witness.

[8] The Indian status test is often referred to as the Rogers test because it is derived from United States v. Rogers, 45 U.S. 567 (1846) (holding a white man could not become an Indian despite the man's adoption into the Cherokee Indian Tribe).

[9] The Cherokee Freedmen were former African-American slaves, owned by members of the Cherokee Nation, who were freed after Emancipation. After the Civil War, the tribe granted Freedmen tribal citizenship. In 2007, Cherokees amended their tribal constitution, making "Indian blood" a requirement for citizenship and stripped Freedmen of their membership. In 2017, a federal court ruled that Cherokee Freedmen had citizenship rights and the Cherokee Nation again granted citizenship rights to Freedmen. Cherokee Nation v. Nash, 267 F.Supp.3d 86 (D.D.C. 2017).

[10] Exhibit A is Parker's Cherokee Nation tribal enrollment packet dated August 4, 2020; Exhibit B is the Cherokee Nation citizenship card of Parker's mother dated August 2019; Exhibit C is an Index and Final Rolls of the Freedmen of the Cherokee Tribe showing Parker's relatives; Exhibit D is a family tree with birth certificates of Parker, his mother and grandfather and the death certificate of his great, great grandfather; Exhibit E are versions of the Cherokee Freedmen roll showing the names of Parker's ancestors; Exhibit F is a copy of the Cherokee Nation Reservation Census of 1890, 1900, 1920, and 1940, showing the names of Parker's ancestors as residents of the Cherokee Nation Reservation; Exhibit G is the Cherokee Roll of Indians by blood showing the name of the man who owned Parker's great, great, great grandmother and the 1860 federal slave schedules for Arkansas; Exhibit H is Parker's great, great, great grandmother's application for enrollment in the Cherokee Nation; Exhibit I is Parker's great, great grandmother's application for enrollment in the Cherokee Nation and Dawes packet; Exhibit J is Parker's great, great grandparents' application for allotment and homestead with the Cherokee Nation; and Exhibit K is a letter from the Cherokee Nation Real Estate Services showing the crime scene address is located within the boundaries of the Cherokee Nation Reservation. The State objected to Exhibit K only insofar as it contained the legal conclusion that the Cherokee Nation Reservation remains intact, but stipulated to the location of the offense.

[11] Because of Parker's failure to establish recognition, the district court did not address the blood quantum issue or whether the crime occurred in Indian country.

[12] Formal tribal citizenship alone is sufficient to meet the political recognition prong of the Indian status test. See, e.g., United States v. Zepeda, 792 F.3d 1103, 1115 (9th Cir. 2015); United States v. Stymiest, 581 F.3d 759, 764 (8th Cir. 2009); St. Cloud v. United States, 702 F.Supp. 1456, 1461 (D.S.D. 1988); United States v. Torres, 733 F.2d 449, 456 (7th Cir. 1984).

[13] The evidence below showed he initiated the application process for membership after his conviction in this case.

[14] The State's concern is that a defendant might claim he is Indian in a state court, defeating state court jurisdiction, and yet be found not Indian in federal court, escaping criminal prosecution altogether. This is a valid concern but one sufficiently addressed by making sure the test for Indian status used by this Court mirrors that used by the federal courts.

[15] The Tenth Circuit uses a totality of the evidence approach in its determination of Indian status. Diaz, 679 F.3d at 1187. The Ninth Circuit considers these factors exclusively for recognition. United States v. Zepeda, 792 F.3d 1103, 1114 (9th Cir. 2015). The Eighth Circuit considers all relevant facts for recognition in no order of importance. Stymiest, 581 F.3d at 764. The court in St. Cloud considered these factors for recognition in declining order of importance. St. Cloud, 702 F.Supp. at 1461.

[16] While this appeal was pending, Parker filed a motion to remand this case to the district court for the purpose of supplementing the record with DNA evidence showing he has a "North Native American ancestry," and with evidence he was granted membership in the Cherokee Nation nearly three years after commission of this crime. Neither of these is probative of whether, at the time of the crime, he was recognized as an Indian by a federally recognized tribe or the federal government. This motion is therefore denied.

 

 

KUEHN, P.J., CONCURRING IN RESULT:

¶1 Although a thoroughly written opinion, the Majority delves into the abyss of the Rogers test prongs unnecessarily. United States v. Rogers, 45 U.S. 567 (1846). Under Rogers, the Appellant must show by prima facie evidence that he has 1) some Indian blood and 2) that he is recognized as an Indian by a tribe or federal government. I believe the Appellant loses on both prongs upon the disclosure that his relatives were Cherokee Freedmen.[1]

 

¶2 Appellant introduced evidence that his family members were Cherokee Freedmen, former African American slaves of the Nation freed after emancipation. In 2007, the Nation amended its constitution to include "Indian blood" as a requirement for membership, which stripped the Freedmen of citizenship. The amendment's consequence was the exclusion of African Americans whose ancestors were enslaved by the tribe prohibiting them from obtaining full Cherokee Nation citizenship rights. Then, in February of 2021, the Cherokee Nation's Supreme Court ruled that the words "by blood" were removed from its constitution and other legal doctrines. Effect of Cherokee Nation v. Nash, No. SC-17-07, 2021 WL 2011566, at *2 (Cherokee Sup. Ct. Feb. 22, 2021). Therefore, this ruling presupposes that if Appellant argues he is a tribal member through Freedmen relation alone, he cannot present prima facie evidence of blood quantum, the first prong of the Rogers test. As Appellant attempted to do in this case, a person cannot prove they have a specific blood relation to a particular tribe through a D.N.A. test result.

 

¶3 Even without consideration of blood quantum, the trial court faced another uncertainty in the law in the aftermath of the McGirt decision -- the political hotbed of the Freedmen's treatment by the tribes regarding tribal recognition. Tribes have an absolute right to determine who is a citizen of the tribe. But, for criminal jurisdiction, mere citizen status is simply a non-starter.[2]

 

¶4 Just as a defendant cannot wait years to claim Indian status without a hint of pride and participation in their heritage, a defendant cannot claim, even if a tribe changes their requirements for membership, that they are now magically a member of a tribe for federal criminal jurisdictional purposes.[3]

 

¶5 As the Majority notes, the Appellant provided a D.N.A. test result reflecting a small percentage at a small confidence level of Native American blood which did not delineate Cherokee blood. Since the Cherokee Nation does not require any blood quantum to be a member of the Tribe and the D.N.A. report is vague, his tribal card does nothing to establish the first prong of the Rogers test. As well, Judge Priddy rightfully decided Appellant failed to prove by prima facie evidence that he had tribal recognition at the time of the crime.[4]

 

FOOTNOTES

 

[1] Here the trial court decided a lack of prima facie evidence as to the second prong and did not adjudicate the first prong.

[2] I do not believe a tribe would specifically change its constitutional requirements for membership to help persons avoid State prosecution. I argue that when requirements can change through a democratic process, the change can affect more than the status of tribal membership.

[3] The McGirt decision is limited to federal criminal jurisdiction under specific federal statutes.

[4] In footnote 16, the Majority states the Appellant did not get his tribal card until three years after the crime. I find this irrelevant, as he could have established through other factors that he had tribal recognition. The timing of the receipt of a tribal card is not all telling and not required to establish the second prong of the Rogers test. In other words, the second prong is not answered with the question, "did the Appellant have his or her tribal card at the time of the crime?"

 

 

LEWIS, JUDGE, CONCURRING IN RESULTS:

¶1 Trying to navigate the recognition test with the Cherokee and Freedmen is a bit complicated. The majority finds the Cherokee tribe didn't recognize Appellant. I don't agree with that general statement, rather I agree with Judge Priddy's finding that the record conveys a lack of any relevant evidence supporting recognition under Diaz, Prentiss and Goforth.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2021 OK CR 27, ROTH v. STATE
Cited


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1989 OK CR 75, 782 P.2d 401, STATE v. KLINDT
Discussed
 1991 OK CR 58, 811 P.2d 1337, THOMAS v. STATE
Discussed
 2001 OK CR 1, 19 P.3d 294, 72 OBJ 371, HOOKS v. STATE
Discussed
 2001 OK CR 3, 19 P.3d 866, 72 OBJ 388, PICKENS v. STATE
Discussed
 2005 OK CR 24, 126 P.3d 625, SALAZAR v. STATE
Discussed
 2005 OK CR 28, 126 P.3d 662, McHAM v. STATE
Discussed
 2006 OK CR 19, 139 P.3d 907, HOGAN v. STATE
Discussed at Length
 2007 OK CR 16, 157 P.3d 1155, SMITH v. STATE
Discussed at Length
 2007 OK CR 33, 168 P.3d 1139, GOMEZ v. STATE
Discussed
 2008 OK CR 23, 188 P.3d 1284, MACK v. STATE
Discussed
 2009 OK CR 11, 205 P.3d 1, GRANT v. STATE
Discussed at Length
 2009 OK CR 31, 223 P.3d 980, SANCHEZ v. STATE
Discussed
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed
 2011 OK CR 6, 248 P.3d 918, HARMON v. STATE
Discussed
 2013 OK CR 1, 293 P.3d 198, MALONE v. STATE
Discussed at Length
 2018 OK CR 7, 419 P.3d 271, DAVIS v. STATE
Discussed
 2018 OK CR 8, 419 P.3d 283, LAMAR v. STATE
Discussed
 2018 OK CR 14, 422 P.3d 782, LEE v. STATE
Discussed at Length
 2018 OK CR 19, 422 P.3d 788, BRAMLETT v. STATE
Discussed
 2018 OK CR 30, 428 P.3d 326, MACK v. STATE
Discussed at Length
 2018 OK CR 31, 431 P.3d 929, BENCH v. STATE
Discussed
 2018 OK CR 37, 433 P.3d 1264, MASON v. STATE
Discussed at Length
 1975 OK CR 145, 538 P.2d 1109, BERNARD v. STATE
Discussed
 1982 OK CR 48, 644 P.2d 114, GOFORTH v. STATE
Discussed at Length
 1985 OK CR 132, 709 P.2d 202, SPUEHLER v. STATE
Discussed
 2000 OK CR 17, 12 P.3d 20, 71 OBJ 2286, Young v. State
Discussed
Title 20. Courts
 Cite
Name
Level

 20 O.S. 3001.1, Setting Aside Judgment on Ground of Misdirection of Jury or Error in Pleading or Procedure
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 13.1, Required Service of Minimum Percentage of Sentence - Offenses Specified
Cited
 21 O.S. 711, First Degree Manslaughter
Cited
 21 O.S. 733, Justifiable Homicide by Other Persons
Cited


 
 








 
 
 
 

 
 




 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA