STATE v. BRESTER
2023 OK CR 10
531 P.3d 125
Case Number: S-2021-209
Decided: 05/11/2023
THE STATE OF OKLAHOMA, Appellant v. WINSTON WHITECROW BRESTER, Appellee
Cite as: 2023 OK CR 10, 531 P.3d 125

 

 

O P I N I O N

ROWLAND, PRESIDING JUDGE:

¶1 This is a consolidated appeal of orders issued by the District Court of Ottawa County, the Honorable Becky Baird, Special Judge, dismissing, for lack of jurisdiction, Brester's final conviction in Ottawa County District Court Case No. CF-2018-298 as well as three pending prosecutions against him in Ottawa County District Court Case Nos. CF-2020-129, CF-2020-177, and CF-2020-178.See McGirt v. Oklahoma, 140 S.Ct. 2452, 2459 (2020) (noting State courts generally lack jurisdiction to prosecute Indians who commit certain crimes in Indian country). The State announced its intent to appeal the district court's ruling in open court and perfected the instant appeal. We exercise jurisdiction under 22 O.S.2011, § 1053

 

Post-Conviction Case

 

¶2 Brester filed for post-conviction relief in November 2020 seeking dismissal of his conviction in Case No. CF-2018-298.McGirt claim challenging the State's jurisdiction because of his Indian status and the location of the crime. Brester pleaded guilty in the case in June of 2019 and received a suspended sentence. He did not move to withdraw his plea and that conviction became final on June 28, 2019.

¶3 The district court granted Brester post-conviction relief and dismissed his final conviction on the basis that the State lacked jurisdiction and that a court's jurisdiction may be challenged at any time.State ex rel. Matloff v. Wallace, 2021 OK CR 21497 P.3d 686cert. denied, 142 S.Ct. 757 (2022), and held the ruling in McGirt would not be applied retroactively to void convictions that were final when McGirt was decided. Id. 2021 OK CR 21Matloff controls and requires reversal of the district court's ruling granting Brester post-conviction relief in CF-2018-298. Because Brester's conviction was final in that case when McGirt was decided, his conviction stands, and the State may resume its efforts to revoke his suspended sentence.

McGirt Claim 

¶4 Brester sought dismissal of his state criminal charges by filing motions to dismiss in each of his three pending cases. Brester objected to the State's jurisdiction based on federal law and McGirt because he is a member of the federally recognized Seneca-Cayuga Nation and his alleged crimes were committed in Indian country.

¶5 The district court considered Brester's motions to dismiss over the course of two hearings. The State stipulated that Brester is an Indian based upon his tribal membership in a federally recognized tribe at the time the crimes were allegedly committed. The parties stipulated that the charges alleged in CF-2020-177 and CF-2020-178, crimes allegedly committed at the Ottawa County jail, occurred within the historic boundaries of the Ottawa Reservation. The parties also stipulated that the charges in CF-2020-129 occurred within the historic boundaries of the "United Peorias and Miami's reservation." The State argued that the Ottawa Reservation had been disestablished through termination and that the Peoria Tribe's interest in the United Peoria/Miami Reservation had been likewise disestablished through termination, leaving the status of the Miami Tribe's interest in the reservation to be determined.

¶6 We first consider whether the district court correctly held that an Indian defendant committed a crime in Indian country. The contested question in this case, like McGirt, is whether Congress explicitly disestablished or diminished either reservation, so that it no longer constituted Indian country at the time the charged offenses were allegedly committed. In our analysis, we afford the district court's factual findings, that are supported by the record, great deference and review those findings for an abuse of discretion. Parker v. State, 2021 OK CR 17495 P.3d 653Id.; Smith v. State, 2007 OK CR 16157 P.3d 1155

Ottawa and Peoria Reservations

¶7 The State agrees that Congress expressly established a reservation for the Ottawa Indian Tribe and the Peoria Indian TribeSee Pub. L. No. 943, 70 Stat. 963, 25 U.S.C. § 841-853 (repealed 1978) [hereinafter "Ottawa Termination Act]; Pub. L. No. 921, 70 Stat. 937, 25 U.S.C. § 821-826 (repealed 1978) [hereinafter "Peoria Termination Act"]; and Reinstatement of Indian Tribes of Oklahoma, Pub. L. No. 95-281, 92 Stat. 246, 25 U.S.C. § 861 (1978) [hereinafter "Reinstatement Act"].

¶8 During the short-lived termination era of federal Indian policy, Congress passed a number of termination acts, terminating its relationship with various tribes., 70 Stat. 963, 25 U.S.C. § 841-853. The stated belief underlying federal termination policy was that it would result in Indians freely managing their own affairs and lead to prosperity commensurate with the general population. H.R.Rep.No. 95-1019 (1978).

¶9 Congress likewise terminated the Peoria Tribe on August 2, 1959. Pub. L. No. 921, 70 Stat. 937. The purpose of the Peoria Termination Act was to "provide for the termination of Federal supervision over the affairs of the Peoria Tribe of Indians located in northeastern Oklahoma and the individual members thereof . . . ." Like the Ottawa Termination Act, it removed all restrictions on the sale or encumbrance of tribal trust and restricted land presently owned by tribal members regardless of location. It ended federal supervision of tribal property, federal services available to tribal members as well as subjected tribal members to state law jurisdiction. Not surprisingly, neither termination act mentioned the respective Tribe's reservation because few, if any, believed Oklahoma still had Indian reservations at that time. See Oklahoma v. Castro-Huerta, 142 S.Ct. 2486, 2499 (2022) (observing that prior to McGirt, "[m]ost everyone in Oklahoma previously understood that the State included almost no Indian country").

¶10 The policy of termination, however, was a failure. It lasted but twenty years before Congress reversed course and adopted a policy focused on recognizing tribal sovereignty. Congress began passing various acts in the 1970's, reinstating terminated tribes, like the Ottawas and Peorias, to the full participation in the broad range of federal programs and services available to tribes and tribal members. H.R.Rep.No. 95-1019 (1978). The Reinstatement Act involving both the Ottawas and Peorias expressly repealed the Ottawa Termination Act and Peoria Termination Act and fully restored all "rights and privileges" to the Tribes and their members, including statutory and treaty rights that were or might have been "diminished or lost" because of termination. Pub. L. No. 95-281, 92 Stat. 246, 25 U.S.C. § 861.

¶11 The State acknowledged in the district court that the termination acts did not explicitly state that the reservations were disestablished, but maintained disestablishment was the intended and obvious result of termination. The State insisted below, and now on appeal, that the termination of governmental supervision over tribal land results in reservation disestablishment because "land cannot be reservation land without being under federal superintendence." According to the State, a tribe's reservation cannot exist if the tribe and its members are not recognized and protected as Indians under federal law.

¶12 The district court rejected the State's position and observed in its ruling that the State's extensive research had not yielded any clear statutory language of disestablishment by any Act of Congress and the State's disestablishment argument was based entirely on non-statutory considerations. The district court noted there was "no language" in the Ottawa Termination Act terminating anything other than federal supervision over tribal trust land and restricted property and federal services to tribal members. The district court ultimately made no finding concerning whether the Ottawa Termination Act extinguished or reduced the existing Ottawa Reservation because Congress repealed termination and restored to the Ottawas all rights and privileges under Federal treaty, statute, or otherwise which may have been diminished or lost by termination, which necessarily included its reservation established by the Omnibus Treaty of 1867. It applied the same reasoning regarding the Peoria Reservation. Because the State was unable to point to a clear expression of congressional intent to terminate the reservations, coupled with the subsequent unqualified repeal of termination and reinstatement of all treaty rights, the district court found the State's argument was insufficient to prove disestablishment under McGirt.

¶13 "To determine whether a tribe continues to hold a reservation, there is only one place we may look: the Acts of Congress." McGirt, 140 S.Ct. at 2462. Congress must express its intent to disestablish a reservation explicitly, with either an "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests." McGirt, 140 S.Ct. at 2463 (quoting Nebraska v. Parker, 136 S.Ct. 1072, 1079 (2016)). It is Congress, and Congress alone, who has the power to abrogate reservation treaties, and "this Court [will not] lightly infer such a breach once Congress has established a reservation." McGirt, 140 S.Ct. at 2462 (citing Solem v. Bartlett, 465 U.S. 463, 470 (1984)).

¶14 The State, as previously noted, does not dispute that the Ottawas and Peorias had reservations prior to termination. In undertaking our analysis concerning the present status of the reservations, we are keenly aware of the pronouncement affirmed in McGirt that "[o]nce a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." McGirt, 140 S.Ct. at 2468 (quoting Solem, 465 U.S. at 470). Brester and the amici also remind us that courts construe statutes in favor of the Indians, resolving ambiguities in their favor and not lightly finding reservation diminishment. Hagen v. Utah, 510 U.S. 399, 411 (1994).

¶15 The district court found the provisions in the termination acts ultimately of no consequence because of Congress's express, unqualified repeal of those laws in 1978. Brester and the amici therefore maintain that whatever impact termination had on the reservations vanished by repeal, leaving the reservations, if diminished by termination, restored and intact.

¶16 We begin by analyzing the Reinstatement Act using well-known rules of statutory construction, starting with "a statute should be given a construction according to the fair import of its words taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." Gillioms v. State, 2022 OK CR 3504 P.3d 613Luna-Gonzales v. State, 2019 OK CR 11442 P.3d 171McGirt, 140 S.Ct. at 2469.

¶17 The Reinstatement Act opens by expressly re-extending Federal recognition to the Ottawas and Peorias. Public Law 95-281, 92 Stat. 246, 25 U.S.C. § 861. Section 1(b) explicitly repeals the Ottawa Termination Act and the Peoria Termination Act. Id. One obvious effect of statutory repeal is that the repealed law no longer exists, and its life is at an end. Generally, when an act of the legislature is repealed, it must be considered as if it never existed. Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).

¶18 In addition to the repeal of termination, Section 1(c) of the Reinstatement Act states:

There are hereby reinstated all rights and privileges of each of the tribes ... and their members under Federal treaty, statute, or otherwise which may have been diminished or lost pursuant to the Act relating to them which is repealed by subsection (b) of this section. Nothing contained in this Act shall diminish any rights or privileges enjoyed by each of such tribes or their members now or prior to enactment of such Act, under Federal treaty, statute, or otherwise, which are not inconsistent with the provisions of this Act.

¶19 The State offers two arguments to support its claim that the Reinstatement Act and its repeal of termination did not automatically revive everything that was previously terminated, specifically the Tribes' reservations. First, the State claims the Reinstatement Act's language in Section 1(d)--that "nothing contained in this Act shall alter any property rights or obligations"--limits the Act's otherwise broad language of reinstatement. The State claims that restoring the reservation status of land necessarily alters property rights by subjecting use of the land to federal or tribal limitations. Hence, because property rights were to be unaltered by the Reinstatement Act, the State asserts recognition was restored to the Tribes and their individual members but not their reservation land.

¶20 Second, the State claims rights affected by termination were lost if not expressly reinstated. In other words, the Reinstatement Act's silence concerning reservation boundaries should be interpreted to mean that the reservations were not restored, especially given that other acts of reinstatement contain specific provisions establishing or denying reservations. The State further argues that construing the Reinstatement Act as creating reservations raises constitutional questions about Congress's ability to create reservations within a state without first acquiring title to the land or the State's consent. According to the State, upholding the district court's finding that the Tribes' reservations were reinstated would allow Congress "to declare lands be reserved for Indians by fiat, stripping a state of a measure of its sovereignty and jurisdiction" without its consent in violation of the federal Constitution's Enclave Clause. We disagree.

¶21 The lack of any provision addressing the reservations in either the acts of termination or the Reinstatement Act proves little because few, if any, thought Oklahoma had Indian reservations after statehood. Under McGirt, such assumptions were wrong about the existence of Indian reservations in Oklahoma.

¶22 In addition, we cannot read Section 1(d) as an attempt by Congress to disestablish or diminish reservation boundaries. Section 1(d) contains the prefatory phrase "[e]xcept as specifically provided in this Act."

¶23 We also find the State's argument--that reservation restoration would violate the Enclave Clause--is without merit. Indian country is part of a state's territory. Castro-Huerta, 142 S.Ct. at 2494. Nevertheless, Indian lands do not constitute the sort of territories subject to exclusive federal jurisdiction that requires state consent under the Enclave Clause. The Enclave Clause empowers Congress to "exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards and other needful Buildings[.]" U.S. Const., art. 1, § 8, cl. 17. Indian reservation land does not fall within the Enclave Clause because federal jurisdiction is not exclusive since non-Indians may reside and own property on a reservation and remain subject to state, not federal or tribal, jurisdiction. States also have concurrent jurisdiction over crimes committed by non-Indians against Indians in Indian country. Castro-Huerta, 142 S.Ct. at 2504-05. Because Indian land remains subject to some state authority, reinstating the reservations would not require state consent. See Surplus Trading Co. v. Cook, 281 U.S. 647, 650-51 (1930) (observing Indian reservation is not federal enclave because state civil and criminal laws still apply to non-Indians); Upstate Citizens for Equality, Inc. v. United States, 841 F.3d 556, 571-72 (2d Cir. 2016) (finding no Enclave Clause violation because federal jurisdiction is not exclusive on Indian land).

¶24 What is clear from McGirt is that we must take Congress at its statutory word. Also clear is that reservation land need not be under federal superintendence as most, if not all, of the City of Tulsa, for example, is Indian country by virtue of its location within the historic boundaries of the never disestablished Creek and Cherokee Reservations. See Castro-Huerta, 142 S.Ct. at 2499 (observing that 43% of Oklahoma, including Tulsa, is Indian country). Present ownership and historic treatment of the land are not dispositive. See McGirt, 140 S.Ct. at 2464, 2468 (observing reservation status of land is not altered by the historical treatment of land set aside as a reservation or the ownership of individual plots within its boundaries). The Ottawa and Peoria Termination Acts, as conceded in the district court, did not explicitly disestablish the reservations. Regardless, when Congress expressly repealed the termination acts involving these two Tribes without any limitation or savings clause, those Acts were rendered a legal nullity. Congress made clear in the Reinstatement Act that it was not only repealing termination but also restoring the Tribes to the status and rights they enjoyed prior to termination. Congress used clear, explicit, and broad language in reinstating "all rights and privileges." The word "all" has an expansive and unlimited meaning. As applied here, it means treaty and statutory rights and privileges of whatever kind diminished or lost by termination. See Castro-Huerta, 142 S.Ct. at 2496 (stating "the text of a law controls over purported legislative intentions unmoored from any statutory text" and we "will presume" that "the legislature says what it means and means what it says") (internal citations omitted). Congress exercised its legislative prerogative to undo the effects of its earlier termination acts and returned the Tribes to their status prior to termination. The Reinstatement Act's plain language, which we are tasked with interpreting, neither addressed reservation disestablishment nor excluded the reservations from reinstatement. Congress may, however, at any time address the Tribes' reservations in light of McGirt and explicitly disestablish one or both if it so chooses.

¶25 In sum, the Treaty of 1867 created a reservation for both the Ottawa and Peoria Tribes. These reservations, even if diminished or terminated by each Tribe's respective termination act, were restored by Congress with the express and unqualified repeal of these termination acts in the 1978 Reinstatement Act as well as with the express reinstatement of all rights and privileges lost in connection with termination. For these reasons, we hold, the district court did not err in ruling that, for purposes of federal criminal law, the land upon which the parties agree Brester allegedly committed the charged crimes in CF-2020-129, CF-2020-177, and CF-2020-178 is Indian country.

 

Other Claim

 

¶26 The State submits alternatively that it may have jurisdiction in Case Nos. CF-2020-177 and CF-2020-178, even if the Ottawa Reservation is intact. It contends for the first time on appeal that Congress explicitly subjected fee lands within the historic Ottawa Reservation to all state law, both criminal and civil, in section 6 of the General Allotment Act of 1887 a.k.a the Dawes Act, 24 Stat. 388, 25 U.S.C. § 331. The district court neither considered this theory of state jurisdiction nor examined the fee status of the Ottawa County Jail, the location of the charged crimes in these cases. Should we reject its claim that the Ottawa Reservation was disestablished, the State maintains remand is necessary to resolve whether the Dawes Act permits state jurisdiction on fee lands on the Ottawa Reservation, and if so, whether the crimes occurred on reservation fee lands subject to state jurisdiction under section 6 or occurred on tribal trust lands outside the Dawes Act's provisions.

¶27 The State relies on a series of Supreme Court cases discussing the effect of allotments and the Dawes Act in other contexts, principally state taxation authority and federal liquor regulation on Indian reservations. Goudy v. Meath, 203 U.S. 146 (1906); United States v. Nice, 241 U.S. 591 (1916); Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation, 425 U.S. 463 (1976); County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation, 502 U.S. 251 (1992). The State contends that without remand for fact-finding concerning the specific situs of the crime and its allotment status, the jurisdictional question cannot be resolved.

¶28 Appellee and amicus curiae argue that the State's new theory of jurisdiction should be barred by the doctrine of waiver. Because the State challenges the district court's dismissal on this ground for the first time on appeal, we will review this claim for plain error only. Simpson v. State, 1994 OK CR 40876 P.2d 690Hogan v. State, 2006 OK CR 19139 P.3d 907Id.

¶29 We are not persuaded by the State's claim that those reservation lands allotted in severalty were made subject to state civil and criminal jurisdiction by section 6 of the Dawes Act. The Dawes Act, which in section 1 authorized the President to allot reservation lands "to any Indian located thereon," originally provided in section 6:

That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside . . . .

24 Stat. at 390 (emphasis added). Section 6 was amended in 1906 by the so-called Burke Act Proviso, 34 Stat. 182, to read in relevant part:

That at the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee,
. . . then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside . . . .

25 U.S.C. § 349. (emphasis added).

¶30 The Supreme Court in McGirt explained the Government's policy of allotment toward the Creeks and its legal effect on their reservation:

Tribe members were given deeds for their parcels that "convey[ed] to [them] all right, title, and interest of the Creek Nation . . . One way or the other, individual Tribe members were eventually free to sell their land to Indians and non-Indians alike.

Missing in all this, however, is a statute evincing anything like the "present and total surrender of all tribal interests" in the affected lands. Without doubt, in 1832 the Creek "cede[d]" their original homelands east of the Mississippi for a reservation promised in what is now Oklahoma . . . . And in 1866, they "cede[d] and convey[ed]" a portion of that reservation to the United States . . . . But because there exists no equivalent law terminating what remained, the Creek Reservation survived allotment . . . .

...For years, States have sought to suggest that allotments automatically ended reservations, and for years courts have rejected the argument.

McGirt, 140 S.Ct. at 2463-64 (emphasis added) (internal citations omitted).

¶31 McGirt and earlier Supreme Court cases have consistently rejected arguments that allotment and the subsequent alienation of the original tribal patents in fee disestablished the reservations, and we do so again here.

Remember, Congress has defined "Indian country" to include "all land within the limits of any Indian reservation . . . notwithstanding the issuance of any patent, and, including any rights-of-way running through the reservation." 18 U.S.C. § 1151(a). So the relevant statute expressly contemplates private land ownership within reservation boundaries. Nor under the statute's terms does it matter whether these individual parcels have passed hands to non-Indians. To the contrary, this Court has explained repeatedly that Congress does not disestablish a reservation simply by allowing the transfer of individual plots, whether to Native Americans or others.

McGirt, 140 S.Ct. at 2464 (emphasis added).

¶32 The history of allotment in the Ottawa Reservation is not so different from the Muscogee Creek as to support any different conclusion here. In a series of treaties, the Government promised the Ottawas a reservation in perpetuity. The Government later imposed the tribal allotments authorized by the Dawes Act. Eventually, those restricted allotments were removed from trust, and sold or otherwise transferred in fee from the original allottees. And although, Congress terminated the Ottawa Tribe, it reinstated the Tribe and repealed termination in toto.

¶33 We are informed of no case in which the Supreme Court has held that section 6 of the Dawes Act extended state criminal jurisdiction beyond the persons of the original allottees. The Court's cases offer at least two apparent reasons. The first reason is Congress's repudiation of the allotment policy and much of the Dawes Act in the Indian Reorganization Act of 1934, 25 U.S.C., § 5101 et seq. See County of Yakima, 502 U.S. at 262 (noting the "implausibility, in light of Congress' postallotment era legislation," that section 6 extended state jurisdiction beyond the "literal coverage" of original allottees); and Moe, 425 U.S. at 478-79 (concluding, in light of 1934 reforms, that section 6 could no longer be read to grant plenary state jurisdiction over Indians residing on reservation fee lands).

¶34 The second reason is that a Congressional grant of plenary state jurisdiction in section 6 logically contradicts the "complex intervening jurisdictional statutes directed at the reach of state law within reservation lands[,]" Moe, 425 U.S. at 479, most notably, Congress's 1948 definition of "Indian Country" to include both Indian and non-Indian fee land; and its passage, in 1953, of Public Law 280, 67 Stat. 588, authorizing States to assume civil and criminal jurisdiction over Indians in Indian Country only under specified conditions. See County of Yakima, 502 U.S. at 261. These Acts would make little sense if section 6 were indeed the fountainhead of plenary state criminal jurisdiction in Indian country.

¶35 This Court also declines the invitation to premise "the existence or nonexistence of an Indian reservation . . . upon the ownership of particular parcels of land," making it "necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government." Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 358 (1962). The impractical "checkerboard jurisdiction" that would result is too easily "avoided by the plain language of § 1151[,]" Seymour, id.; and too plainly rejected by the Supreme Court's reasoning in McGirt and other cases. Because the State has not demonstrated that section 6 grants the State criminal jurisdiction on fee lands, we find no plain error and deny this claim.

Impact of Castro-Huerta

¶36 We nevertheless observe that the briefing in this case was submitted prior to the Supreme Court's decision in Castro-Huerta. The Court, in Castro-Huerta, held "that States have jurisdiction to prosecute crimes committed in Indian Country unless pre-empted by federal law; and that neither the General Crimes Act, 18 U.S.C. § 1152, nor Public Law 280, 67 Stat. 588, have pre-empted Oklahoma's concurrent jurisdiction to prosecute non-Indians for crimes against Indians in Indian Country." State v. Ward, 2022 OK CR 16516 P.3d 261Castro-Huerta, 142 S.Ct. at 2494, 2500. "The Court reasoned that the reservations recognized as Indian Country in McGirt and our post-McGirt cases remain part of Oklahoma, rather than separate territories or federal enclaves; and that these federal statutes have not vested the United States with exclusive jurisdiction to prosecute non-Indians for crimes on the reservations." Ward, 2022 OK CR 16Castro-Huerta, 142 S.Ct. at 2502-03. The Supreme Court noted, "[t]o the extent that a State lacks prosecutorial authority over crimes committed by Indians in Indian country (a question not before us), that would not be a result of the General Crimes Act. Instead, it would be the result of a separate principle of federal law that . . . precludes state interference with tribal self-government." Castro-Huerta, 142 S.Ct. at 2495 n. 2. The Court cited White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142-43, 145 (1980), which recognized that "even when federal law does not preempt state jurisdiction under ordinary preemption analysis, preemption may still occur if the exercise of state jurisdiction would unlawfully infringe upon tribal self-government." Castro-Huerta, 142 S.Ct. at 2500-01. It held that under the Bracker balancing test, the State was not barred from prosecuting crimes committed by non-Indians against Indians in Indian country. Id. 142 S.Ct. at 2501. The Court did not undertake any jurisdictional analysis of the Bracker factors with respect to the State's ability to prosecute crimes under the General Crimes Act committed by an Indian against a non-Indian in Indian country. Because the State "has jurisdiction to prosecute crimes committed in Indian country unless state jurisdiction is preempted[,]" id. 142 S.Ct. at 2504, Castro-Huerta leaves unresolved whether the State's jurisdiction to prosecute Indians for crimes under the General Crimes Act in Indian country has been preempted.

DECISION

¶37 For the foregoing reasons, we REVERSE in part and AFFIRM in part the district court's decision dismissing Brester's cases. We REVERSE the ruling of the district court dismissing Brester's already final conviction in Case No. CF-2018-298 and REMAND the matter for further proceedings not inconsistent with this Opinion. We AFFIRM the ruling of the district court dismissing Brester's pending prosecutions in Case No. CF-2020-129 and Case No. CF-2020-178, involving only major crimes. We AFFIRM the district court's ruling concerning the status of the reservation in CF-2020-177 but REMAND this case, which may involve a general crime on the Ottawa Reservation, for the State to pursue, in its discretion, the unresolved Castro-Huerta jurisdictional claim with the condition that the State do so within sixty (60) days of the date of this opinion. Otherwise, the district court's ruling in CF-2020-177 will become final. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2023), the MANDATE is ORDERED issued upon delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF OTTAWA COUNTY
THE HONORABLE BECKY BAIRD, SPECIAL JUDGE

 
 
 
 APPEARANCES IN DISTRICT COURT
 
 
 APPEARANCES ON APPEAL
 
 
 
 
 KENNY WRIGHT
 DISTRICT ATTORNEY OF
 OTTAWA COUNTY
 102 E. CENTRAL AVE.
 SUITE 201
 MIAMI, OK 74354
 ATTORNEY FOR STATE
 
 
 JOHN M. O'CONNOR
 ATTORNEY GENERAL
 OF OKLAHOMA
 BRYAN CLEVELAND
 ASST. SOLICITOR GENERAL
 CAROLINE E.J. HUNT
 ASST. ATTORNEY GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 ATTORNEYS FOR APPELLANT
 
 
 
 
 ANDREW MELOY
 ATTORNEY AT LAW
 HARTLEY LAW FIRM
 103 E. CENTRAL
 SUITE 250
 MIAMI, OK 74354
 ATTORNEY FOR BRESTER

 GREGORY T. BUZZARD
 ATTORNEY AT LAW
 CROWE & DUNLEVY
 500 KENNEDY BLDG.
 321 S. BOSTON AVE.
 TULSA, OK 74103
 AMICUS CURIAE
 FOR PEORIA TRIBE

 JOSEPH F. HALLORAN
 ATTORNEY AT LAW
 JACOBSON, MAGNUSON,
 ANDERSON & HALLORAN
 180 EAST FIFTH ST.,
 SUITE 940
 ST. PAUL, MN 55101
 AMICUS CURIAE
 FOR OTTAWA AND
 MIAMI TRIBES
 
 
 CINDY DANNER
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 P. O. BOX 926
 NORMAN, OK 73070
 ATTORNEY FOR APPELLEE

 D. MICHAEL MCBRIDE, III
 ATTORNEY AT LAW
 CROWE & DUNLEVY
 500 KENNEDY BLDG.
 321 S. BOSTON AVE.
 TULSA, OK 74103
 AMICUS CURIAE
 FOR PEORIA TRIBE

 JOSEPH F. HALLORAN
 ROBIN L. LASH
 ATTORNEYS AT LAW
 JACOBSON, MAGNUSON,
 ANDERSON & HALLORAN
 180 EAST FIFTH ST.,
 SUITE 940
 ST. PAUL, MN 55101
 AMICUS CURIAE
 FOR OTTAWA AND
 MIAMI TRIBES
 
 
 

 

OPINION BY: ROWLAND, P.J.
HUDSON, V.P.J.: Concur
LUMPKIN, J.: Concur in Part and Dissent in Part
LEWIS, J.: Concur in Part and Dissent in Part
MUSSEMAN, J: Concur

FOOTNOTES

21 O.S.2011, § 143121 O.S.2011, § 79721 O.S.2011, § 650.921 O.S.Supp.2015, § 649

State v. Hull, Case No. S-2021-110, a case that was dismissed at the Attorney General's request. The Attorney General filed an objection to the motion on April 24, 2023, stating the Court should decide the issues briefed in this matter only and leave it to the State to select the appropriate case to litigate issues addressed in the supplemental briefing in Hull. On April 26, 2023, Amicus Curiae in this case, the Ottawa Tribe of Oklahoma and Miami Tribe of Oklahoma, sought leave to file a supplemental brief to address the issues raised in the supplemental brief in Hull. The Tribes amended their requests after the State filed its objection to the inclusion of the issues contained in the Hull supplemental briefing. The motion of the Oklahoma District Attorney's Association, the Association of Oklahoma Narcotic Enforcers (AONE) and 23 Oklahoma District Attorneys is REJECTED because these parties have neither sought nor been granted the status of amicus curiae in this case. Rule 3.4(F)(4), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2023). The motions and amended motions of both the Ottawa Tribe of Oklahoma and Miami Tribe of Oklahoma are DENIED.

http://www.nativepartnership.org/site/PageServer?pagename=PWNA_Native_History_terminationpolicyNP#:~:text=From%201953%2D1964%20109%20tribes,Native%20Americans%20lost%20tribal%20affiliation (last visited Apr. 25, 2022).

Castro-Huerta, 142 S.Ct. at 2504-05, that "the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country").

Parker, 2021 OK CR 17 "the term 'Indian' has a specific meaning within the ambit of federal criminal jurisdiction, one that includes both racial and political components of the Indian community."

McGirt demonstrated from a legal standpoint, "there were all sorts of misconceptions . . . that persisted for a century or more" with respect to the existence of Indian reservations in Oklahoma.

See Proposition III.

In re Heff, 197 U.S. 488 (1905), thus barring state civil and criminal jurisdiction over allottees under section 6 until expiration of the entire 25-year trust period and the issuance of patents in fee. The proviso authorized the Secretary of the Interior to issue fee patents to some allottees before expiration of the trust period without subjecting the allottee to plenary state jurisdiction, while freeing the land of "all restrictions as to sale, incumbrance, or taxation[.]" 25 U.S.C. § 349; County of Yakima, 502 U.S. at 264.

 

 

LUMPKIN, JUDGE, CONCUR IN PART/DISSENT IN PART:

¶1 I agree that at this time, this Court is to apply McGirt v. Oklahoma, 140 S.Ct. 2452 (2020) and Oklahoma v. Castro-Huerta, 142 S.Ct. 2486 (2022) to jurisdictional questions involving the prosecution of crimes on Indian land. However, as I have noted previously, Solem v. Bartlett, 465 U.S. 463 (1984) and Nebraska v. Parker, 577 U.S. 481 (2016) are still binding authority. Thus, I continue to see a legal quandary as to how courts should traverse this legal mine field of decisions which do not follow a natural orderly pattern.

¶2 McGirt addressed the disestablishment of Indian reservations, but it completely disregarded the analysis set forth in Solem, and instead focused solely on the exact language of Congressional acts and requiring an act of Congress to specifically state that a reservation was disestablished. If that is the law as to the disestablishment of an existing reservation, which we have in this case, then the same specific language should be required to establish a reservation. The opinion before us does not follow that course and instead allows the general broad language used to reestablish the recognition of a tribe to also reestablish a reservation that has been specifically disestablished. As a result, I believe the argument by the State of Oklahoma has merit and I cannot join in recognizing the reestablishment of the reservation in this case.

¶3 I agree this case should be remanded but the remand should require a full and complete analysis of existing precedent to determine whether a reservation currently exists. That existing process is set forth in the following paragraphs.

¶4 Many courts have viewed the McGirt decision as the definitive statement of the law in this area. However, the decision partially relies upon Worcester v. Georgia, 31 U.S. 515 (1832), a case long ago abrogated by the Supreme Court as pointed out in Castro-Huerta, thus calling into question the legal analysis in McGirt. Furthermore, McGirt overlooked and failed to apply existing binding precedent, namely, Solem and Parker.

¶5 Under Solem, there are three categories to consider in determining whether a reservation has been disestablished: 1) acts passed by Congress and the contemporaneous understanding of those ActsSolem, 465 U.S. at 470--472. In Parker, the Court followed the Solem factors, starting first with examination of the text of the relevant Act of Congress. Parker, 577 U.S. at 488. Second, the Court examined the history "surrounding passage" of the Act. Id., at 490. Third, the Court looked to "subsequent understanding of the status of the reservation by members and nonmembers, as well as the United States and the State." Id., at 488. (internal quotations omitted). This inquiry encompassed the subsequent "demographic history" and "treatment" of the lands at issue. Id., at 492.

¶6 By failing to overrule these two cases, the McGirt Court left in place a long-standing procedure for analyzing the question of the existence of an Indian reservation. In Parker, Justice Thomas, writing for a unanimous court, laid out and specifically followed the analysis set out in Solem to determine if a reservation still existed. Parker, 577 U.S. at 488-94. Those cases are still binding precedent of the Court not followed in McGirt, thus leaving open the question of the proper analysis for determining the existence of a reservation.

¶7 In Castro-Huerta, the court found that "Indian country is part of the State, not separate from the State." Castro-Huerta, 142 S.Ct. at 2493. This finding is the opposite of that found in McGirt. After finding that state jurisdiction was not pre-empted by federal law (in the case of a non-Indian defendant and an Indian victim in Indian country), the court utilized the analysis found in White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142-43 (1980), to determine whether "the exercise of state jurisdiction would unlawfully infringe upon tribal self-government." Id., 142 S.Ct. at 2501. Under the Bracker analysis, the Court looks to the specific issue to determine whether the State action may "unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them." Bracker, 448 U.S. at 142.

¶8 The Castro-Huerta Court specifically examined whether the State's prosecution of a non-Indian defendant for a crime committed against an Indian victim in Indian Country would infringe upon tribal self-government; whether the State's prosecution would harm the federal interest in protecting Indian victims; and whether the State's sovereign interest in ensuring public safety, criminal justice and protecting all crime victims is subordinate to that of the federal government. 142 S.Ct. at 2501-02. After completing its analysis, the Court found no infringement upon tribal sovereignty and held the state and the federal government have concurrent jurisdiction over crimes committed in Indian country by non-Indians against Indians. Id., at 2505.

¶9 It is interesting how similar the Solem/Parker analysis is to that of Bracker, although for different purposes at different procedural stages of analyzing this similar type of legal issue. Thus, this comparison reveals what is lacking in the McGirt decision, an analysis according to binding precedent. That precedent is consistent whether applied at the beginning of the question or after the fact.

¶10 The McGirt decision is a one size fits all approach. The conflicts in existing law as to the methodology and analysis to be used in determining whether a reservation still exists must be analyzed and resolved in order to provide the state and tribes the ability to make rational, consistent legal determinations.

¶11 Thus, I believe the court on remand should start at the beginning rather then at the end of the process as a remand for just a Bracker analysis would do, and determine, applying all existing precedent, if a reservation exists at this time.

¶12 As a result of the above analysis, I find this case must be remanded to determine if a reservation exists and to make the Castro-Huerta and Bracker determinations set out by the Court in its opinion. The District Court must make the determination regarding cases involving the Major Crimes Act and the General Crimes Act.

FOOTNOTES

 

 

LEWIS, J., CONCURRING IN PART AND DISSENTING IN PART:

¶1 I concur in reversing the trial court's order granting post-conviction relief in Case No. CF-2018-298, as the application of McGirt v. Oklahoma to void a conviction that was final when McGirt was decided is unauthorized by law under State ex. rel Matloff v. Wallace.

¶2 I concur in the Court's conclusion that Congress has not disestablished the reservations it previously created for the Ottawa, Miami, and Peoria Tribes. The reservations remain "Indian Country" and because Brester is an Indian, the State of Oklahoma had no jurisdiction to prosecute him for crimes he committed in Indian Country. State v. Klindt, 1989 OK CR 75782 P.2d 401

¶3 I concur that section 6 of the General Allotment (Dawes) Act did not generally vest or extend state criminal jurisdiction over Indians--other than the original allottees mentioned in the Act--to lands allotted in severalty pursuant to the General Allotment Act. This theory of state criminal jurisdiction over Indians in Indian Country is plainly rejected in McGirt and other authorities.

¶4 I respectfully dissent to the portion of the opinion remanding for the trial court's consideration of the State's claim to concurrent jurisdiction to prosecute Indians for General Crimes Act offenses committed in Indian Country by virtue of Castro-Huerta.

¶5 States have no criminal jurisdiction of crimes committed by Indians in Indian Country unless it is expressly conferred by Congress. See Fisher v. District Court, 424 U.S. 382, 386 (1976); DeCoteau v. District County Court, 420 U.S. 425, 427, n.2 (1975); McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 170-172 (1973); Williams v. Lee, 358 U.S. 217, 220 (1959); United States v. Pelican, 232 U.S. 442, 449-450 (1914), and United States v. Kagama, 118 U.S. 375, 383-384 (1886).

¶6 The Supreme Court in Castro-Huerta held only "that the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country." 142 S.Ct. at 2491 (emphasis added). Castro-Huerta left "undisturbed the ancient rule that States cannot prosecute crimes by Native Americans on tribal lands without clear congressional authorization--for that would touch the heart of 'tribal self-government.'" Castro-Huerta, 142 S.Ct. at 2526 (Gorsuch, J., joined by Breyer, Sotomayor, and Kagan, JJ., dissenting).

¶7 Oklahoma's lack of criminal jurisdiction over Indians in Indian Country has long been settled. In Ross v. Neff, 905 F.2d 1349 (10th Cir. 1990), the Tenth Circuit Court of Appeals held that state officers lacked the authority to arrest or prosecute an Indian for public intoxication in Indian Country. The Court of Appeals in Ross summarized the relevant legal principles:

Indian country is subject to exclusive federal or tribal criminal jurisdiction except as otherwise expressly provided by law. 18 U.S.C. § 1152. Congress has granted general criminal jurisdiction to some states over Indian country within their borders, see, e.g., 18 U.S.C. §§ 1162 (various states), 3243 (Kansas), but no such provision has been made for Oklahoma. Congress has also provided, now in 25 U.S.C. § 1321, a statutory method by which a state, with the consent of the tribe, can assume jurisdiction over Indian country. Oklahoma, however, has not acted to assume jurisdiction by this method . . . Because the state of Oklahoma has neither received by express grant nor acted pursuant to congressional authorization to assume criminal jurisdiction over this Indian country, Adair County, its sheriff, and its subordinate police officers had no jurisdiction to arrest [an Indian for a crime in Indian Country].

Ross , 905 F.2d at 1352 (emphasis added; some internal quotes and citations omitted).

¶8 Oklahoma has no criminal jurisdiction over Indians in Indian Country because Congress has never conferred that jurisdiction. See also, Hackford v. Utah, 845 F.3d 1325 (10th Cir. 2017)(quoting Ute Indian Tribe v. Utah (Ute VI), 790 F.3d 1000, 1003 (10th Cir. 2015)("[W]ithin Indian country, generally only the federal government or an Indian tribe may prosecute Indians for criminal offenses"); Cheyenne-Arapaho Tribes v. Oklahoma, 618 F.2d 665, 668 (10th Cir. 1980) (holding no state authority over Indians in Indian Country unless expressly conferred by Congress); Klindt, supra (holding State had no jurisdiction of crime committed by an Indian in Indian Country).

¶9 The Court's invitation to the State to advance this novel theory of concurrent jurisdiction over Indians in Indian Country is injurious to foundational and longstanding principles of tribal sovereignty. The Court's indulgence for such arguments on remand is both unnecessary and unwise.